**A. Danielle ROUSSEAU**

v.

**CITY OF PHILADELPHIA.**

**Civ. A. No. 81–1947.**

United States District Court, E.D. Pennsylvania.

March 6, 1984.

Harold R. Berk, Philadelphia, Pa., for plaintiff.

Tyler E. Wren, Divisional Deputy City Sol., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

Plaintiff has asserted a number of state and federal claims that essentially seek to hold the City of Philadelphia (the City)[1] responsible for inadequate and unworkmanlike construction by a private contractor who sought to rehabilitate plaintiff's property utilizing funds provided through a federal loan program. Beginning in 1977, plaintiff undertook the rehabilitation effort in question with the assistance of low interest loan funds made available by the Department of Housing and Urban Develop-

---

1. Plaintiff also sued the City's Office of Housing and Community Development (OHCD): Gregory L. Coleman, the director of OHCD; Mayor William Green; HUD; and Samuel L. Pierce, the Secretary of HUD. Defendants HUD and Samuel L. Pierce were dismissed for lack of subject matter jurisdiction by an order dated October 27, 1981. Defendants OHCD, Coleman, and Green were dismissed voluntarily by stipulation of counsel approved by this court on February 3, 1984.

ment (HUD) under the Section 312 loan program, 42 U.S.C. § 1452b.[2] Although a private contractor performed the rehabilitation work on plaintiff's property, plaintiff seeks to impose liability on the City, which acted as the local public agency responsible for administering the Section 312 program.

Plaintiff takes issue with several aspects of the City's administration and processing of her rehabilitation loan. In particular, plaintiff contends that the City restricted the amount of available loan funds by improperly treating her property as containing only two dwelling units, approved an unqualified and inexperienced contractor to perform the work, wrote insufficient work specifications, and approved the inadequate work performed by the contractor. In addition, plaintiff avers that once the workmanship problems came to light, the City failed to assist her in her disputes with the contractor, and failed to release emergency funds from its escrow account to permit plaintiff to hire another contractor to complete the work. Plaintiff contends that these actions and omissions on the part of the City caused damage to her property. She further contends that long delays in the completion of the rehabilitation project have cost her significant amounts of money above the loaned amount, and have prevented her from using and enjoying her property.

Count I of plaintiff's complaint claims that the City's actions and omissions violated the City's federal statutory obligations under the Section 312 loan program. Count II presents a constitutional claim under 42 U.S.C. § 1983, alleging that the

City caused plaintiff's property to be taken without just compensation and that the City acted in an arbitrary and capricious manner in violation of the fifth and fourteenth amendments. Counts III through VII assert various state claims, including common law negligence, gross negligence, intentional infliction of emotional distress, intentional denial of the use and enjoyment of property, and violation of fiduciary duties.

The City now moves for summary judgment on all of plaintiff's claims. The City's motion relies on several grounds, many of which potentially are dispositive or partially dispositive of this action.[3] Because I find that a private right of action is not maintainable for the claimed federal statutory violations, and that the City has not caused an unconstitutional taking of plaintiff's property; summary judgment will be granted in favor of the City on Counts I and II. In light of this holding on plaintiff's federal claims, I will decline to exercise pendent jurisdiction over plaintiff's state law claims. Counts III through VII, therefore, will be dismissed for lack of federal subject matter jurisdiction, subject to the rights plaintiff may have under 42 Pa.Cons.Stat.Ann. § 5103(b)(1) to transfer such state causes of action to state court.

I. *Factual Background*

For the purpose of the present motion, the City does not dispute plaintiff's version of the facts. Plaintiff owns and resides at the property identified as 4800 Chester Avenue in Philadelphia. In 1977 she applied to the City's Office of Housing and Com-

2. Section 312 refers to the original section number in the Housing Act of 1964, Pub.L. 88–560, § 312, 78 Stat. 769 (1964). For purposes of clarification in this opinion, the rehabilitation loan program in question will be identified generally as the Section 312 loan program. In making specific statutory references, however, I will use the official code section designation, § 1452b.

3. In its 38-page memorandum in support of its motion for summary judgment, the City posits the following grounds: lack of jurisdiction because no private right of action exists, lack of a right of action under § 1983 because the City

has not acted under color of state law and because federal rights are not secured by § 1452b or the handbook; lack of a sufficient deprivation of property or a denial of substantive rights under the Constitution; the actions of the City's employees did not reflect policies of the City; the federal claims are barred by the analogous statute of limitations; lack of an injury suffered due to the denial of rights under § 1452b; lack of pendent jurisdiction over plaintiff's state claims; and the state claims are barred by the applicable statute of limitations and/or the Political Subdivision Tort Claims Act.

munity Development (OHCD) for assistance in rehabilitating her property under the Section 312 program. Initially, HUD approved an estimated loan of $20,000 in September, 1977, without inspecting plaintiff's property, in order to reserve funds that had become available in the latter part of fiscal year 1977. At that time, plaintiff's property was divided into two dwelling units. Plaintiff, however, advised OHCD that she intended to rehabilitate the garage at the rear of her property to accommodate one additional dwelling unit. Plaintiff applied and received a variance from the Philadelphia Zoning Board in December, 1977, that permitted three dwelling units on her property.

During 1978, OHCD prepared written specifications for the rehabilitation of plaintiff's property. In April, 1978, OHCD advertised for bids from eligible contractors. The lowest bidder, Anthony DeCicci, submitted a bid of $57,625 to complete the specified work. OHCD approved DeCicci, but he was unable to proceed with construction at that time because the supply of Section 312 funds available in fiscal year 1978 had been exhausted. In October, 1978, Section 312 funds again became available and HUD approved a $58,000 loan for the plaintiff in order to meet the cost of rehabilitation under the DeCicci bid. HUD then cancelled the original loan reservation of $20,000. The approved loan funds were placed in an escrow account held on behalf of the plaintiff by the City. OHCD then notified plaintiff that construction could proceed. Contractor DeCicci, however, refused to start construction because inflation during the intervening months had increased construction costs beyond the amount contemplated by his bid, and because he had undertaken other work.

Plaintiff experienced difficulty in obtaining another contractor willing to bid on her rehabilitation project, apparently because of problems associated with the City's administration of the Section 312 program. Eventually, a contractor named Al Masino submitted his qualifications to OHCD for review, and was approved. Masino submitted a bid in the amount of $70,867, which exceeded the approved loan amount of $58,000. OHCD informed plaintiff that she was not eligible for any further increase in her Section 312 loan above the $58,000, because that amount represented the maximum she could obtain for a property having two dwelling units. Plaintiff, however, previously had obtained the zoning necessary for three dwelling units and had specified three dwelling units on her Section 312 loan application. As a result of the differential between the cost of the Masino bid and the amount of the approved loan, several work items were removed from the written specifications and plaintiff was required to undertake these items with her own financing if the project was to proceed. Masino then revised his bid by deleting items, whereby the total bid would correspond to the amount of the approved Section 312 loan funds. Plaintiff and Masino executed a contract in the amount of $57,625. The remaining work that had been deleted from Masino's bid was to be completed under a second contract with financing to be obtained privately by plaintiff separate from the Section 312 program.

In May, 1979, plaintiff signed a "proceed order" authorizing Masino to begin work. After waiting for certain permits to be issued by the Department of Licenses and Inspections, Masino employed a very inexperienced construction staff, and his own experience was limited. The largest construction project Masino had undertaken prior to bidding on plaintiff's project was for a contract price of about $15,000.

Masino and his employees performed much of the rehabilitation work in an unworkmanlike manner, leaving areas of plaintiff's property in violation of City housing codes. In particular, most of the windows were installed incorrectly, leaving gaps that permitted rain and the elements to enter plaintiff's property. Most of the electrical work was done in violation of electrical codes. Plumbing work was done improperly and was cited for violation by the Department of Licenses and Inspections. Insulation work also was installed improperly. During the course of con-

struction, Masino and his crew failed to secure the property, thereby causing substantial damage to plaintiff's furniture and property. Although OHCD inspected the work on plaintiff's property during its construction, none of OHCD's inspectors offered any comments concerning the inadequate and unworkmanlike performance.

Masino was not financially secure and needed to obtain a loan from the Philadelphia Citywide Development Corporation (PCDC) to advance funds for the performance of the rehabilitation work on plaintiff's property. Masino's lack of funds required plaintiff to make the initial interest payment on Masino's loan with PCDC. Masino also was unable to meet several payrolls, and this failure required plaintiff to advance Masino further loans. Masino encountered cost overruns and refused to provide plaintiff with documentation of his claimed costs. As a result of Masino's defective and unworkmanlike performance and his cost overruns, plaintiff instructed Masino to stop work on the project as of September 25, 1979. Thereafter, despite several meetings, no compromise among the parties could be reached. Masino filed for arbitration, and plaintiff counterclaimed. Following a hearing, plaintiff was awarded a judgment in arbitration of approximately $18,500. Masino unsuccessfully appealed, and then filed for bankruptcy before plaintiff could collect her judgment.

During her dispute with Masino, plaintiff had requested that OHCD permit her to use the funds remaining in her Section 312 escrow account in order to finance emergency rehabilitation work. The City, however, refused her request. Finally, in 1980, HUD approved a new loan for plaintiff under the Section 312 program in the amount of $81,000 to replace the $58,000 loan. HUD also provided plaintiff with a grant in the amount of $11,000. The total cost of rehabilitation, however, still exceeded the available funds. Plaintiff undertook additional rehabilitation work on her property from the fall of 1980 through the spring of 1981, but a substantial amount of rehabilitation work remains to be completed to rehabilitate the property as contemplated when the Section 312 loan was originally approved. Plaintiff does not have an operational kitchen, her electrical work is incomplete, and many other items of the original 1978 written specifications have yet to be completed. During the winter months, plaintiff has been able to use only one or two rooms of her property. In addition, inflation in the construction industry has further increased the total cost of construction. Contractors have estimated that the cost to complete the rehabilitation work is between $71,000 and $100,000. Plaintiff has been required to obtain additional financing at conventional rates. She has suffered the loss of rental income on the two contemplated rental units on her property, and has suffered emotional harm from her ordeal.

Although plaintiff's version of the facts, which must be taken as true, is quite compelling, the critical question for purposes of the present motion is whether such facts justify the relief sought under federal law. Before turning to the specifics of plaintiff's federal statutory and constitutional claims, however, a brief description of the Section 312 program is in order.

## II. *The Section 312 Loan Program*

The statutory authority for the Section 312 rehabilitation loan program appears in 42 U.S.C. § 1452b. This statute identifies the considerations relevant in determining eligibility for rehabilitation loans, § 1452b(a); specifies certain terms and conditions to be included in such loans, § 1452b(c); and authorizes the appropriation of funds to the Secretary of HUD, § 1452b(d). The relevant eligibility considerations look to the location and condition of the property to be rehabilitated and the financial condition of the prospective applicant. § 1452b(a). The specified terms and conditions set the maximum interest rate, term and amount allowable for each rehabilitation loan. § 1452b(c).

In addition, the statute vests HUD with the authority to delegate its functions and duties to local public or private agencies,

§ 1452b(f), and with the power to issue rules and regulations and to impose requirements and conditions upon loans awarded under the program, § 1452b(g). Accordingly, HUD entered into an agreement with the City that designated OHCD as the local public agency responsible for administering the Section 312 loan program for the Philadelphia area. *See* Agreement for City of Philadelphia Section 312 Rehabilitation Loans (June 21, 1977). This agreement gives the City the final authority to approve applications for Section 312 loans in connection with property containing up to four dwelling units. *Id.* at paragraph 2. Such approval, however, is subject to HUD's verification that sufficient loan funds are available. *Id.* The agreement also specifies that the City's authority to approve Section 312 loans is to be exercised in accordance with the procedures and requirements established by HUD. *Id.* at paragraph 4.

One source of HUD procedures and requirements for local public agencies is a document entitled Rehabilitation Financing Handbook, 7375.1 Rev. (1974) (the Handbook). The Handbook, issued by HUD, outlines in detail the administrative functions of the local public agency. In particular, the Handbook directs that the local public agency inspect the prospective recipient's property, determine the work to be done, and calculate the amount of loan funds necessary to complete the contemplated work. After HUD verifies and reserves the necessary loan funds, the Handbook directs the local public agency to prepare work specifications and to assist the recipient in obtaining bids from private contractors, selecting an acceptable contractor, preparing the contract documents, and executing a contract with the lowest approved bidder. During performance of the rehabilitation work, the Handbook directs the local public agency to maintain the recipient's loan funds in an escrow account, inspect the work performed, and release the loan funds for payment.

The Section 312 loan program thus generally establishes HUD as the source of financing, delegates administrative duties to local agencies, and leaves the actual rehabilitation work to be performed by the recipient or a private contractor. In the present action, plaintiff seeks to hold the City responsible for the private contractor's unsatisfactory performance, because of the City's failure to carry out properly the administrative functions specified in the Handbook.

III. *Discussion*

A. *Plaintiff's Federal Statutory Claim*

Plaintiff presents three theories to support her federal statutory claim against the City in Count I: (1) a private right of action expressed in 42 U.S.C. § 1452b(e), (2) a private right of action implied in the Section 312 loan program, and (3) a private right of action under 42 U.S.C. § 1983. The City contends that this court lacks subject matter jurisdiction over plaintiff's statutory claim because no private right of action exists under any of these theories. Although the City is correct in contending that a private right of action is not maintainable, this assertion goes to the merits of the case, (*i.e.*, whether the plaintiff has asserted a cause of action), and not to this court's jurisdiction.

Generally, if the plaintiff raises a "substantial" claim under federal law, federal jurisdiction is proper and the court must address the merits of the claim. *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913). A federal court does not lose its subject matter jurisdiction because it ultimately decides against the plaintiff on the merits of the federal claim, unless the claim of a federal right is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy ...." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974). *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–29, 57 L.Ed.2d 595 (1978); *Hagans v. Lavine*, 415 U.S. 528, 542–43, 94

S.Ct. 1372, 1381–82, 39 L.Ed.2d 577 (1974); *Bell v. Hood*, 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). This principle extends to the claim of an implied right of action under federal law. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). As the subsequent discussion of plaintiff's federal statutory claim reveals, plaintiff's claim, although not ultimately successful, is not so insubstantial or frivolous that a federal controversy does not exist. I shall proceed, therefore, to decide whether plaintiff has stated a federal statutory claim for which this court may grant damages or other relief.

■ Plaintiff's theory of an express right of action under 42 U.S.C. § 1452b(e) can be dispatched with little difficulty. Section 1452b(e) states:

(e) In the performance of, and with respect to, the functions, powers, and duties vested in him by this section, the Secretary shall have (in addition to any authority otherwise vested in him) the functions, powers, and duties set forth in section 1749a of Title 12 (except subsection (c)(2)).

42 U.S.C. § 1452b(e). Among the functions, powers and duties specified under 12 U.S.C. § 1749a and incorporated by reference in Section 1452b(e) is that the Secretary may "sue or be sued". 12 U.S.C. § 1749a(c)(3). Plaintiff attempts to elevate this language into an expressed authorization for a private right of action to redress violations of Section 1452b. The "sue or be sued" language, however, "merely indicates that the Secretary is capable of being sued." *Fox v. City of Chicago*, 401 F.Supp. 515, 517 (N.D.Ill.1975). This language simply confers a status or capacity upon the Secretary, and makes no expression that a private right of action is the necessary or appropriate means of enforcing the statute. Moreover, the defendant in the present suit is the City, which acted under the authority delegated by the Secretary pursuant to 42 U.S.C. § 1452b(f). The "sue or be sued" language does not indicate that agents or delegates of the Secretary were meant to sue or be sued in the same capacity as the Secretary. Consequently, Section 1452b(e) cannot be said to authorize an express right of action for the claimed statutory violations.

■ Plaintiff's theory of an implied right of action requires a more detailed examination of the Section 312 loan program. The thrust of the Supreme Court decisions on implying rights of action from federal statutes is to focus the inquiry squarely on Congressional intent. *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377–378 & n. 60, 102 S.Ct. 1825, 1838–39 & n. 60, 72 L.Ed.2d 182 (1982) and cases cited therein. A person seeking to imply a right of action must establish that Congress intended such an action despite the statute's silence on the question of private enforcement. *United States v. FMC Corp.*, 717 F.2d 775, 780 (3d Cir.1983). In discerning Congressional intent, the Court has assigned the greatest weight to the first two factors of the four part test articulated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). *See California v. Sierra Club*, 451 U.S. 287, 297–98, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 580, 99 S.Ct. 2479, 2491, 61 L.Ed.2d 82 (1979) (Brennan, J., concurring) *FMC Corp.*, 717 F.2d at 781. The first two *Cort* factors are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted).

The first *Cort* factor requires analysis of the language of the statute itself. *Universities Research Association v. Coutu*, 450 U.S. 754, 771, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15,

100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross*, 442 U.S. at 568, 99 S.Ct. at 2485. This factor presents the threshold question of whether the statutory language confers enforceable federal rights upon the plaintiff. *Cannon v. University of Chicago*, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). After determining that a particular statute confers federal rights upon the plaintiff, the second *Cort* factor looks to the legislative history of the statute to determine whether Congress intended the beneficiaries to enforce such federal rights by means of a private action for damages. *Id.* at 694, 99 S.Ct. at 1956.

Looking first to the language of § 1452b, plaintiff contends that she is a member of an identifiable class that Congress intended to benefit in establishing the Section 312 loan program. She describes the contours of the class of intended beneficiaries as "owners and tenants of property," 42 U.S.C. § 1452b(a), located in urban renewal, code enforcement or community development areas, 42 U.S.C. § 1452b(a)(1)(A), (a)(1)(B), who are "unable to secure the necessary funds from other sources upon comparable terms and conditions." 42 U.S.C. § 1452b(a)(2). She claims that § 1452b confers upon this class an especial benefit in the form of direct loans at a low interest rate for the purpose of rehabilitating property.

Assuming that this description identifies a class of intended beneficiaries that is distinguishable from the general public,[4] it cannot be said that the statute expressly or implicitly confers federal rights upon the beneficiaries. Although the first *Cort* factor is phrased in terms of identifying the intended beneficiaries of the statute, the identification of a class of beneficiaries is meant to facilitate the more fundamental determination of whether the statute creates enforceable federal rights. *FMC Corp.*, 717 F.2d at 781. In defining what is

meant by an "especial" benefit, the Supreme Court has phrased the relevant inquiry as "whether the statute create[s] a federal right in favor of the plaintiff," *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088. The assertion of a benefit to identifiable parties "is, by itself, irrelevant: [t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *FMC Corp.*, 717 F.2d at 781 (quoting *Sierra Club*, 451 U.S. at 294, 101 S.Ct. at 1779.)

A decisive consideration in determining whether Congress intended to confer enforceable federal rights upon a class of beneficiaries is the existence or absence of right-creating language in the statute. *Coutu*, 450 U.S. at 771–72, 101 S.Ct. at 1461–62; *Cannon*, 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13. The language of § 1452b, however, clearly is not phrased in right-creating terms. The statute merely states that "the Secretary is authorized" to make rehabilitation loans to qualified owners and tenants of property. 42 U.S.C. § 1452b(a). Rather than creating a right to any federal loans, this language of authorization appears to permit the Secretary to exercise discretion in making loan funds available. In addition, the general "considerations" that define the class of potential loan recipients are phrased in negative terms: "No loan shall be made unless ...." *Id.* This language constitutes more a description of minimum eligibility requirements than a grant of entitlement or right to federal rehabilitation loan funds. Congress, therefore, "rather than drafting the legislation 'with an unmistakeable focus on the benefitted class,' instead has framed the statute simply as a general prohibition or command to a federal agency." *Coutu*, 450 U.S. at 772, 101 S.Ct. at 1462 (quoting *Cannon*, 441 U.S. at 691, 99 S.Ct. at 1955).

**4.** The language of § 1452b does not necessarily isolate a distinguishable class of beneficiaries. For example, although the language of § 1452b(a)(2) appears to reserve the rehabilitation loan funds for low income property owners, such language actually does not exclude

potential loan recipients, because it is improbable given the recent history of interest rates that anyone could secure loan funds from another source at an interest rate "comparable" to the three percent offered under the Section 312 loan program.

**970**

Plaintiff thus presents an even less compelling case for implying a right of action than the student in *Murphy v. Villanova University*, 547 F.Supp. 512 (E.D.Pa. 1982), who was terminated from work-study employment when his authorized federal work study funds were exhausted. In *Murphy*, the federal statute itself required that the grant agreement between the Department of Education and the university include specified terms and conditions protecting students from termination of employment in the event that their earnings exceeded the amount of their authorized work study funds. Although the federal statute created a duty on the part of the Secretary of Education to include the required terms and conditions in the agreement with the university, Judge Pollak held that the statute was simply "a directive to [a] federal agenc[y] engaged in the disbursement of public funds," that did not create enforceable rights in the student beneficiaries. *Id.* at 519 (quoting *Coutu*, 450 U.S. at 772, 101 S.Ct. at 1462). In the present case, the statute similarly is phrased as a "directive to a federal agency in the disbursement of public funds." In addition, § 1452b does not regulate the terms of the Secretary's agreement with the City, nor does it regulate the quality of the rehabilitation work performed by the private contractor. Section 1452b, therefore, creates no federal rights capable of enforcement through a private right of action by rehabilitation loan recipients.

The legislative history of § 1452b reinforces the conclusion that Congress did not contemplate an implied private right of action. The legislative history is entirely silent as to any type of private enforcement. The congressional reports and debates that plaintiff offers in support of a private right of action establish only that Congress intended to make loan funds available for the rehabilitation of property located in urban renewal areas. For example, plaintiff cites the following passage from the Report of the House Subcommittee on Housing:

> The program is designed to provide a source of financing to those persons and businesses in an urban renewal area who are presently unable to undertake necessary rehabilitation of their property because they cannot obtain loans in sufficient amounts or at such terms as they can afford to carry ....
>
> ....
>
> ... The committee believes that a direct loan low-interest rate program of the type provided by this bill is a feasible method of stimulating private owners to undertake needed rehabilitation of their property in urban renewal areas.

H.R.Rep. No. 1703, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 3416, 3431–32. This passage, like the others cited by plaintiff, fails to demonstrate any intention on the part of Congress to create enforceable federal rights in favor of loan recipients. On the contrary, the use of language such as "a source of financing," and "stimulating private owners to undertake needed rehabilitation," suggests that Congress intended to provide recipients only with a source of low-interest loan funds to facilitate private rehabilitation efforts and not with a right of action should such efforts go awry.

The language and legislative history of § 1452b thus contrasts with that of the Trust Indenture Act, for which the Third Circuit recognized an implied private right of action in *Zeffiro v. First Pennsylvania Banking & Trust Co.*, 623 F.2d 290 (3d Cir.1980). In *Zeffiro*, the language of the statute itself created mandatory terms to be included in indentures for the benefit of investors, and the legislative history stated that "enforcement of the provisions of the indenture may appropriately be left to the fundholders themselves." 623 F.2d at 298 (quoting S.Rep. No. 248, 76th Cong., 1st Sess., 8 (1939)). Neither the language nor the legislative history of § 1452b provides such support for the implication of private enforcement.

The thrust of plaintiff's theory of an implied private right of action derives not from the language or legislative history of § 1452b, but rather from the provisions of the Rehabilitative Financing Handbook.

As noted earlier, the Handbook issued by HUD sets forth detailed directions for the local public agency to follow in administering the Section 312 loan program. Plaintiff's statutory claim basically seeks to hold the city liable for its failure to comply properly with the administrative duties specified by HUD in the Handbook.

Plaintiff contends that the Handbook provides a source of enforceable federal rights because it was issued under the statutory authority of § 1452b(g). Section 1452b(g) authorizes the Secretary of HUD "to issue such rules and regulations and impose such requirements and conditions ... as he determines to be desirable to carry out the objectives of this section...." 42 U.S.C. § 1452b(g). The express language of § 1452b(g), however, does not indicate that the rules, regulations, requirements, or conditions that the Secretary may deem "desirable" in carrying out the objectives of the Section 312 loan program were intended to create enforceable federal rights in favor of loan recipients. In particular, nothing in the language of § 1452(g) suggests that Congress intended to confer upon loan recipients the right to any particular level of supervision or direction by the local public agency or quality in the rehabilitation work performed by an independent contractor funded by Section 312 loans.

█ The absence of right-conferring language in § 1452b precludes plaintiff from implying a right of action for the provisions of the Handbook. A rule or regulation promulgated under the authority of a federal statute cannot alone provide the source of an implied right of action if the specific language of the statute does not authorize such a result. *Touche Ross*, 442 U.S. at 577 & n. 18, 99 S.Ct. at 2489 & n. 18; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). "It suffices to say .... that the language of the statute and not the rules must control." *Touche Ross*, 442 U.S. at 577 n. 18, 99 S.Ct. at 2489 n. 18.

█ In addition, the mere issuance of the Handbook by HUD does not necessarily raise its provisions to the level of a federal rule or regulation. Federal agencies must satisfy the notice and comment requirements of the Administrative Procedure Act in order to promulgate substantive rules and regulations that carry the force and effect of law. 5 U.S.C. § 553. Handbooks that have not been published in accordance with the APA generally are considered to be non-binding instructions or internal operating procedures. *First State Bank of Hudson County v. United States*, 599 F.2d 558, 564 (3d Cir.1979); *Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29, 38 (3d Cir.1976); *McCullough v. Redevelopment Authority*, 522 F.2d 858, 867–68, n. 27 (3d Cir.1975); *Feldman v. HUD*, 430 F.Supp. 1324, 1327–28 (E.D.Pa. 1977). The Handbook, although issued by HUD, has not been published in the Federal Register.

Plaintiff nonetheless contends that HUD did not need to publish the Handbook officially because the APA excepts "matters relating to ... contracts" from its publication requirements. 5 U.S.C. § 553(a)(2). As will be discussed later, however, it is not clear that plaintiff actually has a contract with HUD that incorporates the provisions of the Handbook. In addition, there is no evidence that HUD intended that the Handbook carry the force of a substantive rule or regulation in the absence of publication. On the contrary, HUD has expressed the policy of promulgating all of its substantive rules and regulations in accordance with the notice and comment procedure, regardless of the exceptions in 5 U.S.C. § 553(a)(2). *See* 24 CFR § 10.1 (1983).

The structure of the relationship between HUD and the City under the Section 312 loan program further demonstrates that, in issuing the Handbook, HUD did not intend to confer enforceable rights upon loan recipients. The agreement between HUD and the City that delegates administrative responsibility to the City expressly provides for termination of available funds as the remedy for the City's failure to comply with the requirements of the Sec-

tion 312 loan program. *See* Agreement for City of Philadelphia, Section 312 Rehabilitation Loans, § 5(a) (June 21, 1977). The Supreme Court has stated that "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance, but rather action by the Federal Government to terminate funds to the State." Pennhurst State *School and Hospital v. Halderman* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). In addition to expressly specifying the "typical remedy" of termination, the agreement further provides that "such failure [of the City to comply with requirements of the Section 312 loan program] shall not create or justify any claim against the Government on the part of any third person ...." Agreement for the City of Philadelphia, § 5(a). Although this language only expressly addresses private claims against the government, this provision manifests an intention on the part of HUD to foreclose private enforcement of the Handbook provisions by loan beneficiaries. Thus the provisions of the Handbook, like the more general provisions of § 1452b, do not independently provide a source of enforceable federal rights.

Finally, plaintiff contends that the provisions of the Handbook are enforceable as part of a contract among herself, the City, and HUD. This contract purportedly consists of four documents: plaintiff's application for a rehabilitation loan, the promisory note executed by plaintiff, a document specifying terms and conditions of plaintiff's loan, and the Handbook. Confirming the existence of such a contract would require analysis of each document in order to determine whether the four documents, taken as a whole, evidence a contractual relationship among the parties. Such an analysis is neither necessary nor appropriate at this point. Issues concerning the existence and interpretation of a contract, particularly as between plaintiff and the City, are matters to be determined under state law. Any rights accruing to plaintiff as a result of her contractual relationship with the City would be contractual, not federal rights. The provisions of the Handbook would not confer rights as an independent source of federal law, but rather as an operative element of plaintiff's contract. Plaintiff's recourse in the event that the City violated the Handbook provisions would be an action under state law for breach of contract, and not a federal right of action.

Plaintiff's third theory in support of her statutory claim in Count I is a right of action under § 1983. Section 1983 provides an express remedy for the deprivation by persons acting under color of state law "of any rights, privileges and immunities secured by the constitution and laws ..." of the United States. 42 U.S.C. § 1983. Plaintiff contends that the City deprived her of rights secured by § 1452b and the Handbook.

The Supreme Court recognized a right of action under § 1983 for federal statutory violations in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In contrast with the restrictive approach of the Court in the area of implied rights of action under federal law, *Maine v. Thiboutot* opened the door to private actions for violations of federal statutory rights, provided that such violations were committed by persons acting under color of state law. The Court, however, subsequently articulated two limitations on the applicability of § 1983 to federal statutory violations. *See Middlesex County Sewerage Authority v. National Sea Clammers Assoc.*, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 at 28, 101 S.Ct. 1531 at 1545, 67 L.Ed.2d 694. A § 1983 statutory right of action is not available (1) if Congress has "foreclosed private enforcement of [the] statute," or (2) unless "the statute [is] the kind that create[s] enforceable 'rights' under § 1983." *Sea Clammers*, 453 U.S. at 19, 101 S.Ct. at 2626.

The Court has offered little guidance as to the identification of statute-created federal rights in the context of § 1983 actions. In *Pennhurst*, the Court remanded the

case for determinations as to both limitations. 451 U.S. at 28, 101 S.Ct. at 1545. In *Sea Clammers*, the Court did not reach the question of whether the statute at issue created federal rights because it held that, in any event, Congress had foreclosed a § 1983 right of action by drafting an extensive enforcement scheme in the statute. 453 U.S. at 19, 101 S.Ct. at 2625.

This is not to say that we are sailing in totally uncharted waters. Reference to the Court's analysis in implied rights of action cases provides guidance in applying the § 1983 exceptions. Such exceptions closely resemble the first two factors of the *Cort* test for implying rights of action under federal law. The first step. under both the implied rights analysis and the § 1983 exceptions is to determine whether the statute at issue confers enforceable federal rights upon the plaintiff. The second step looks to Congressional intent regarding the private enforcement of such rights. In this latter inquiry, the implied rights analysis and the § 1983 analysis diverge. Whereas an implied private action is available only if Congress so intends, a § 1983 private action appears to be available unless Congress manifests an intention to foreclose such an action.

■ For present purposes, however, the analysis need not reach the second step. The threshold question under both the implied rights analysis and the § 1983 statutory analysis is whether the statute at issue creates federal rights in favor of the plaintiff. The preceeding discussion in the context of plaintiff's theory of an implied right of action regarding the right-creating effect of § 1452b and the Handbook is dispositive of plaintiff's § 1983 statutory claim as well. Neither the language of the statute nor the Handbook creates federal rights capable of enforcement through a § 1983 private action.

### B. *Plaintiff's Constitutional Claim*

In Count II of her complaint, plaintiff asserts a § 1983 claim for the City's violation of her constitutional rights. Plaintiff's formulation of this constitutional claim has shifted to some extent. In her complaint, plaintiff alleges that "[d]efendants' conduct and/or failure to act ... is so careless, irrational, arbitrary and capricious as to violate her rights under the Fourteenth Amendment ...." In her pretrial memorandum and in response to the present motion, however, plaintiff asserts that by refusing to release the remaining escrowed loan funds to permit her to undertake emergency repairs and to hire a replacement contractor, the City has taken plaintiff's property without compensating her. Both formulations of plaintiff's constitutional claim involve the application of the fifth amendment's guarantee that private property shall not be "taken for public use, without just compensation." [5] U.S. Const. amend. V. This "taking" clause applies to the states by way of the fourteenth amendment. *Chicago, Burlington & Quincy Railroad v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

■ At the outset, it is not clear that plaintiff possessed a property interest sufficient to warrant constitutional protection. The only property interest plaintiff asserts is in the loan funds held in escrow on her behalf by the City. In order to hold a property interest in a benefit of this type, however, plaintiff must establish a "legitimate claim of entitlement" that is more than a mere "unilateral expectation." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The provisions of the Handbook and the terms and conditions of plaintiff's loan, however, establish at best that the City was required to release the escrow funds only to pay for work actually performed and approved. Plaintiff's assertion of a right to release of the escrowed loan

---

**5.** The assertion that a public body has acted arbitrarily and unreasonably in regulating the use of private property to promote the health, safety, morals or general welfare of the public at large is essentially a claim for the "taking" of such property without just compensation. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

funds simply amounts to a unilateral expectation on her part.

In addition, the character of the City's actions cannot be said to constitute a "taking." The City, acting as the escrow agent for the Section 312 loan program, simply refused to release the escrowed funds to plaintiff while the litigation between plaintiff and Masino was pending. The City did not appropriate or exact any of the escrowed funds for public use, *see, e.g., Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1981) (county's taking of interest accruing on interpleader funds deposited with the county court), nor did the City's interference cause a substantial diminution in the value of the plaintiff's property such that plaintiff was forced "to bear public burdens, which in all fairness, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

■ Finally, any injury plaintiff sustained by reason of the City's refusal to release the escrowed loan funds was remedied subsequently by HUD. Not only did HUD approve a replacement loan at a higher amount to enable plaintiff to continue her rehabilitation effort, but HUD also provided plaintiff with an outright grant of funds. Under these circumstances, it cannot be said that the City effected a taking of plaintiff's property without just compensation in the course of administrating the Section 312 loan program.

### C. *Plaintiff's State Law Claims*

■ The disposition of plaintiff's federal claims raises the issue of whether to exercise pendent jurisdiction over Counts III through VII of plaintiff's complaint, which present claims arising only under state law. Earlier in this opinion, I held that plaintiff's federal claims were of sufficient substance to confer federal subject matter jurisdiction on this court. This court, therefore, possesses the power to exercise pendent jurisdiction over plaintiff's state claims. *United Mine Workers*

*v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The exercise of such power, however, is a matter within this court's discretion. *Id.* at 726, 86 S.Ct. at 1139. Where the plaintiff's federal claims are dismissed on a motion for summary judgment, this court "should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976). *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

■ I find no extraordinary circumstances that would warrant exercising jurisdiction over plaintiff's state law claims. In particular, I note that the Pennsylvania transfer statute, 42 Pa.Cons.Stat.Ann. § 5103(b)(1), permits plaintiff to transfer her state law claims to state court following a dismissal by this court for lack of subject matter jurisdiction. *See McLaughlin v. ARCO Polymers, Inc.*, 721 F.2d 426, 430–31 (3d Cir.1983). Consequently, I will decline to exercise pendent jurisdiction over plaintiff's state law claims and such claims will be dismissed for lack of federal subject matter jurisdiction.