[No. B121754. Second Dist., Div. One. Sept. 3, 1999.]

REDDING MEDICAL CENTER, Plaintiff and Appellant, v.
DIANA M. BONTA´, as Director, etc., Defendant and Respondent.

**COUNSEL**

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Carol Wallacker Schultz, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**MASTERSON, J.**—Appellant Redding Medical Center requested reimbursement from respondent, the California Department of Health Services (sometimes DHS), for the portion of hospital equipment expenses Redding claimed were attributable to services provided to Medi-Cal patients. DHS auditors later concluded that the instructions followed by Redding in making its request, which required use of a statistical surrogate to calculate the extent of Medi-Cal usage, were inapplicable because Redding's books and records permitted the direct assignment of these expenses. On Redding's challenge to the audits, the administrative law judge and the superior court agreed with DHS. We also agree with DHS. We therefore affirm the judgment of the trial court denying Redding's petition for writ of mandate.

### BACKGROUND

We summarize the law and facts pertinent to the issues raised by Redding in its briefing to this court. (See *Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317].)

The Medicaid program, which is authorized by title XIX of the Social Security Act, 42 United States Code section 1396 et seq., is a health insurance program for the indigent. Medi-Cal, which is California's version of this program, is administered by DHS. (See *Memorial Hospital-Ceres* v. *Belshé* (1998) 67 Cal.App.4th 233, 235 [78 Cal.Rptr.2d 824]; *Mercy Hospital & Medical Center* v. *Department of Health Services* (1981) 115 Cal.App.3d 270, 276 [171 Cal.Rptr. 374].) Among the health care services that must be provided by states participating in the Medicaid program are hospital inpatient services. (42 U.S.C. § 1396d(a)(1).) Redding provides such services.

Under California Code of Regulations, title 22, section 51536, DHS is required to reimburse providers of inpatient hospital services by making interim payments as services are rendered and bills submitted throughout a fiscal year. At the end of the year, the provider submits a Medi-Cal cost report, on which DHS bases a "final settlement." The final settlement is later reconciled with the interim payments to determine whether there have been any underpayments or overpayments to the provider. Unless providers of hospital services are specifically Medi-Cal contracting hospitals (Redding is not), they are to be reimbursed for their "[a]llowable costs determined in accordance with applicable Medicare standards and principles of reimbursement." (Cal. Code Regs., tit. 22, § 51536, subd. (a)(2).) "Allowable cost means the hospital's allowable Medi-Cal cost permitted by applicable Medicare standards and principles of reimbursement, 42 CFR, Part 405 [now part

413] and HIM-15 [now the Provider Reimbursement Manual, parts I and II]." (Cal. Code Regs., tit. 22, § 51536, subd. (b)(4); see *Intercommunity Medical Center* v. *Belshé* (1995) 32 Cal.App.4th 1708, 1711 [39 Cal.Rptr.2d 43].)[1]

"All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries." (42 C.F.R. § 413.9(a) (1990).) "Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations . . . take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program." (*Id.*, § 413.9(b)(1); PRM-I, § 2102.1.) "Implicit in the intention that actual costs be paid to the extent they are reasonable, is the expectation that the provider seeks to minimize its costs and that its actual costs do not exceed what a prudent and cost-conscious buyer pays for a given item or service [citation]." (PRM-I, § 2102.1.)

Reimbursement amounts requested in cost reports "must be based on [providers'] financial and statistical records which must be capable of verification by qualified auditors.[2] The cost data must be based on an approved method of cost finding . . . ." (42 C.F.R. § 413.24(a).) "Cost finding is the process of recasting the data derived from the accounts ordinarily kept by a provider to ascertain costs of various types of services furnished. It is the determination of these costs by the allocation of direct costs and proration of indirect costs." (*Id.*, § 413.24(b)(1).)[3] "After the close of the accounting period, providers must use one of the [specified] methods of cost finding to determine the actual costs of services furnished during that

---

[1]The Provider Reimbursement Manual (PRM) is promulgated by the Health Care Financing Administration, a federal agency within the United States Department of Health and Human Services that administers the Medicare and Medicaid programs. (See *Garfield Medical Center* v. *Belshé* (1998) 68 Cal.App.4th 798, 801 [80 Cal.Rptr.2d 527].) The foreword to the PRM states that the "manual provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services . . . ." However, "it does not have the effect of regulations." (*Ibid.*)

Citations to the PRM-I and PRM-II are to the versions relevant to this proceeding.

[2]"Cost information as developed by the provider must be current, accurate, and in sufficient detail to support payments made for services rendered to beneficiaries. This includes all ledgers, books, records and original evidence of cost . . . which pertain to the determination of reasonable cost, capable of being audited." (PRM-I, § 2304.)

[3]"Directly allocable costs are chargeable based on actual usage (e.g., metered electricity) rather than a statistical surrogate." (PRM-I, § 2302.4A.) "Indirectly allocable costs are not chargeable based on actual usage, and thus, must be allocated on the basis of a statistical surrogate (e.g., square feet)." (PRM-I, § 2302.4B.)

period." (42 C.F.R. § 413.24(d).) The first of these, which is the one at issue in this case, is the "Step-down Method." (*Id.*, § 413.24(d)(1).)[4]

Instructions for cost finding are contained in PRM-II, section 2411, which is captioned, "Worksheet B, Part I - Cost Allocation - General Service Costs and Worksheet B-1 - Cost Allocation - Statistical Basis."[5] Section 2411 states, inter alia, that "Worksheets B, Part I, and B-1 have been designed to accommodate the step-down method of cost finding. . . . [¶] . . . [¶] Worksheet B-1 provides for the proration of the statistical data needed to equitably allocate the expenses of general service cost centers . . . ."[6] A provision of section 2411 captioned "Column Descriptions" refers to columns of worksheet B-1 for allocation on a square-foot basis of capital-related costs of buildings and fixtures, and of movable equipment. With respect to movable equipment (column 2), section 2411 states: "If you do not directly assign the depreciation on movable equipment and expenses pertaining to movable equipment such as insurance, interest and rent as part of your normal accounting systems, you must accumulate the expenses in this cost center [i.e., in column 2]."

For the fiscal periods ending May 31, 1992, and May 31, 1993, Redding recorded all depreciation and rental expenses of its movable equipment by "lumping" them together in its general ledger rather than directly assigning the expenses to specific cost centers. Redding's cost reports for these two years therefore calculated reimbursement amounts based on figures appearing in column 2 of PRM-II, section 2411's worksheet B-1. As such, costs were prorated among various departments and cost centers of the hospital according to the square footage of each department or cost center.

DHS later conducted on-site audits of these cost reports pursuant to Welfare and Institutions Code section 14170. The audits, which were issued

[4]The only official description of this method of which we are aware appears in 42 Code of Federal Regulations, section 413.24(d)(1), as follows: *"Step-down Method.* This method recognizes that services furnished by certain nonrevenue-producing departments or centers are utilized by certain other nonrevenue-producing centers as well as by the revenue-producing centers. All costs of nonrevenue-producing centers are allocated to all centers that they serve, regardless of whether or not these centers produce revenue. The cost of the nonrevenue-producing center serving the greatest number of other centers, while receiving benefits from the least number of centers, is apportioned first. Following the apportionment of the cost of the nonrevenue-producing center, that center will be considered 'closed' and no further costs are apportioned to that center. This applies even though it may have received some service from a center whose cost is apportioned later. Generally, if two centers furnish services to an equal number of centers while receiving benefits from an equal number, that center which has the greatest amount of expense should be allocated first."

[5]The foreword to part II of the PRM explains that this part contains reporting forms and instructions for computing the reasonable cost of services that have been provided.

[6]A "cost center" is "[a]n organizational unit, generally a department or its subunit, having a common functional purpose for which direct and indirect costs are accumulated, allocated and apportioned." (PRM-I, § 2302.8.)

in 1995, concluded that Redding should not have utilized worksheet B-1 in its reimbursement calculations for movable equipment, and that Redding's having done so resulted in overpayments to Redding for both audit years. After a first level administrative appeal, a formal administrative hearing was conducted on October 15, 1996. (Cal. Code Regs., tit. 22, § 51022 et seq.)

At that hearing, DHS auditors testified that worksheet B-1 of PRM-II, section 2411, is not to be utilized where direct costs can be identified and assigned. The auditors were of the opinion that Redding's records permitted identification of equipment rental and depreciation expenses by cost center, thereby requiring the direct assignment of these expenses. For example, with respect to the fiscal period ending May 31, 1993, an auditor testified in pertinent part as follows concerning two adjustments he had made for rental expenses: "[Audit adjustment] 21 was a direct costing of rental (inaudible) expense. Provider's records identify equipment rental (inaudible) in the general ledger by cost center. They made [a certain] classification, taking all rental income expense out of the cost center and put it into an overhead cost center and stepped it down . . . ." "[Audit adjustment] 24 was equipment depreciation, which Provider—the cost was reconciled to the Provider's general ledger, and the general ledger was reconciled to the Provider's (inaudible) that record. The asset records maintained detailed listing of equipment by using cost center."[7]

Redding's manager of Medicare and Medi-Cal appeals testified on its behalf at the administrative hearing. He asserted that depreciation expenses for movable equipment were recorded in a single account, with no direct assignment on the general ledger according to cost center. Rental expenses were handled in a similar manner. Thus, according to the manager, Redding was *required* to utilize worksheet B-1 in its cost reports.

The administrative law judge issued a proposed decision on July 3, 1997, denying Redding's appeal. The judge ruled in pertinent part: "A provider is free to keep its books and records in any manner which complies with applicable record keeping guidelines. . . . [However, the] Department's responsibility upon audit is to determine a provider's allowable costs based upon applicable Medicare standards and principles of reimbursement. This task is undertaken using the books and records maintained by the provider during its normal course of business. The costs at issue in the present matter are clearly identifiable, based upon the Provider's books and records, and

---

[7]Although the appellate record is not clear, it appears that the records to which the auditor referred included a detailed listing of equipment by cost center which had been prepared for the Office of Statewide Health Planning and Development. In any event, Redding has not contested the accuracy of those records.

can be directly assigned to the benefitting cost centers." The administrative law judge's decision was adopted as the final decision on behalf of the Director of DHS on August 13, 1997.

Redding thereafter filed a petition for writ of mandate in superior court pursuant to Code of Civil Procedure section 1094.5, as authorized by Welfare and Institutions Code section 14171, subdivision (j). The petition was denied, and judgment on that denial was filed on March 30, 1998. Redding filed a timely notice of appeal.

## Discussion

One narrow issue is raised in this appeal. It is whether, as Redding contends, "PRM-II, section 2411 clearly requires the . . . expenses in question to be accumulated and allocated as indirect capital-related costs." The answer is clearly no.

The underlying facts are not in dispute; the entries in Redding's books and records have been accepted as accurate. "Where no challenge to the factual findings is made, the appellate court need only determine whether [DHS's] ruling was so arbitrary and capricious as to amount to an abuse of discretion. [Citation.]" (*Intercommunity Medical Center* v. *Belshé, supra,* 32 Cal.App.4th at p. 1711.)

"An agency's interpretation of its own regulations is given great weight. [Citation.]" (*Intercommunity Medical Center* v. *Belshé, supra,* 32 Cal.App.4th at p. 1711.) Although Medicare guidelines are not generally applicable to the Medi-Cal program (*Mission Community Hospital* v. *Kizer* (1993) 13 Cal.App.4th 1683, 1689 [17 Cal.Rptr.2d 303]), as noted above, California Code of Regulations, title 22, section 51536, subdivision (b)(4), requires that allowable costs for inpatient hospital services be determined based on the Medicare provisions of the Code of Federal Regulations and the PRM. Moreover, as one of DHS's auditors testified at the administrative hearing, "Medi-Cal for cost finding purposes has adopted the Medicare reimbursement principles" and "that includes the principles in Medicare Provider Reimbursement Manuals . . . ." Thus, as in *Intercommunity Medical Center* v. *Belshé, supra,* 32 Cal.App.4th at page 1712, "[s]ince [DHS] implements the guidelines as its own regulations, its interpretation is entitled to deference, particularly since the regulations involve complex accounting methods used to distribute Medi-Cal funds." (Accord, *Memorial Hospital-Ceres* v. *Belshé, supra,* 67 Cal.App.4th at p. 238.)

Redding asserts, and correctly so, that "an agency's interpretation of a regulation is not controlling if an alternative reading is compelled by the plain language of the rule under review." There is no "plain language" here.

Nothing in PRM-II, section 2411, permits a provider hospital to utilize one accounting method over another as a matter of its sole discretion. The section 2411 mandate is conditional—"*If* you do not directly assign" expenses, only then use worksheet B-1, column 2. (Italics added.) Under what circumstances direct assignment should or should not be made is simply not addressed. Redding argues that use of worksheet B-1 was required because it did "not directly assign expenses . . . directly to a particular department on its *general ledger*." (Italics in original.) The argument is a non sequitur. Nothing in section 2411 or any other Medicare reimbursement rule to which we have been directed anoints the general ledger as a place where, if certain entries are made, the use of worksheet B-1 is required. Indeed, although section 2411 postulates that the provider has not made direct assignment as "part of [the provider's] normal accounting systems," it places no limitation on what those systems might be reasonably construed by DHS to include.

We find DHS's position that worksheet B-1 is not to be utilized where, as here, costs may be directly assigned, to be strongly supported in both law and fact. With respect to the law, the objective of hospital reimbursement is to ensure that Medi-Cal bears the rental and depreciation costs of movable equipment for services provided to the designated beneficiaries of the program, but not to others. (42 C.F.R. § 413.9(b).) The cost-finding process geared to accomplishing this objective calls for directly assignable costs to be charged based on actual usage rather than a statistical surrogate. (PRM-I, § 2302.4.) With respect to the facts, there is no question that the "ledgers, books [and] records" from which Redding's cost information was to be derived (PRM-I, § 2304) contained sufficient information to permit accurate audit adjustments directly assigning the costs of movable equipment. Under these circumstances, the DHS audits must be upheld.

## DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.