[No. B143160. Second Dist., Div. Five. Aug. 23, 2001.]

RCJ MEDICAL SERVICES, INC., Plaintiff and Respondent, v. DIANA BONTA´, as Director, etc., Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Patricia L. Nagler, Deputy Attorneys General, for Defendant and Appellant.

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Respondent.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

This case involves a postpayment audit of a Medi-Cal provider's claims. Such audits are required under both federal and state law. (42 C.F.R. §§ 447.45(f)(2), 456.3 (2000); Welf. & Inst. Code, § 14170, subd. (a)(1).) No Medi-Cal payments were withheld from the provider.

The California Department of Health Services (DHS) administers Medi-Cal, the federal Medicaid program in California. The DHS contracted with the California State Controller's office (the Controller) to audit Medi-Cal payments to providers. The Health Care Financing Administration (HCFA), part of the United States Department of Health and Human Services, is the federal agency responsible for administering the Medicaid program. On December 17, 1999, the HCFA, a federal agency, specifically approved in writing the DHS's delegation of audit authority to the Controller.

This appeal is from a judgment granting a peremptory writ of administrative mandate directed at defendant, the Director of the DHS. The peremptory writ of mandate requires the DHS to set aside its final decision in the administrative appeal of RCJ Medical Services, Inc. (RCJ), "insofar as it relies upon the audit findings of the State Controller . . . ." RCJ contends federal Medicaid law, and specifically the single state agency requirement, precludes the DHS's delegation of audit authority to the Controller.[1] The question in this case is whether the HCFA's December 17, 1999, written approval of the DHS's delegation of audit responsibility to the Controller is based on a reasonable construction of the federal statutory single state

---

[1] The question whether the Controller is prohibited under federal law from performing Medi-Cal audits or withholding payments to providers is before the United States Court of Appeals for the Ninth Circuit in several cases including *Simonyan v. Connell* (C.D.Cal., Jan. 20, 2000, No. 99-2420 RJK) 2000 WL 562861.

agency provision and the implementing regulation. We defer to the HCFA's construction of the federal law that it administers as reflected in its action of December 17, 1999. Accordingly, we reverse.

## II. FEDERAL MEDICAID LAW

In 1965, Congress enacted title XIX of the Social Security Act (the Medicaid Act) to provide medical assistance to needy persons. (42 U.S.C. § 1396 et seq.) The purpose of the act was to provide a nationwide program of medical assistance for low-income families and individuals. (*Schweiker v. Hogan* (1982) 457 U.S. 569, 571 [102 S.Ct. 2597, 2600, 73 L.Ed.2d 227]; *West Virginia University Hospitals, Inc. v. Casey* (3d Cir. 1989) 885 F.2d 11, 15, affd. (1991) 499 U.S. 83 [111 S.Ct. 1138, 113 L.Ed.2d 68].)

### A. *The Medi-Cal Program and the Single State Agency Requirement*

The Second Circuit Court of Appeals described the joint federal-state operation of the Medicaid program and the single state agency requirement in *Bethphage Lutheran Service, Inc. v. Weicker* (2d Cir. 1992) 965 F.2d 1239, 1240 as follows: "Medicaid, 42 U.S.C. § 1396 *et seq.*, is a cooperative federal-state program through which the federal government provides financial assistance to the states so that the states may furnish medical, rehabilitation, and other services to certain low-income persons. Participation in Medicaid is voluntary, but participating states must comply with certain requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of Health and Human Services ('the Secretary'). For a state to qualify for federal assistance, the Secretary, customarily acting through the Health Care Finance Administration ('HCFA'), must approve a State Plan for medical assistance, 42 U.S.C. § 1396a(a), that contains a comprehensive statement describing the nature and the scope of the state's program. 42 C.F.R. § 430.10 (1989). The plan must designate a single state agency to supervise or administer the State Plan. 42 U.S.C. § 1396a(a)(5)." (Accord, *West Virginia University Hospitals., Inc. v. Casey, supra,* 885 F.2d at p. 15.)

### 1. *The Federal Single State Agency Statute*

The single state agency requirement is set forth in a federal statute. Pursuant to title 42 of the United States Code section 1396a(a)(5)[2], a state participating in the federal Medicaid program must establish a state plan that meets stated requirements. Among other things, the state plan must "provide

---

[2] All further references to section 1396, 1396a, or 1396b, are to title 42 of the United States Code.

for the establishment or designation of a *single State agency* to administer or to supervise the administration of the plan . . . ."[3] (Italics added.)

The single state agency requirement originally appeared in the Social Security Act of 1935 with reference to the Title I Old-Age Assistance Program. (Act of Aug. 14, 1935, ch. 531, § 2, 49 Stat. 620.) The single state agency language was incorporated into title XIX when the Medicaid program was enacted in 1965. (Pub.L. No. 89-97, 1965 U.S. Code Cong. & Admin. News, at pp. 305, 371; *Sobky v. Smoley* (E.D.Cal. 1994) 855 F.Supp. 1123, 1145.) The purposes of the single state agency requirement have been described in various ways. In *Rolland v. Cellucci* (D.Mass. 1999) 52 F.Supp.2d 231, 243, the district court held: "The single state agency mandate arose out of Congress' desire to minimize the improper denial of benefits and to ensure a certain level of services and quality of care. *Morgan v. Cohen*, 665 F.Supp. 1164, 1177 (E.D.Pa. 1987). The mandate accomplishes these goals by limiting the authority to make administrative decisions to a single state agency. 42 C.F.R. § 431.10(e)(1)(ii). . . . [T]he 'single state agency' requirement derives from a desire to focus accountability for plan operation, *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 261 (2d Cir. 1986); 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.1 and 431.10 . . . ." In *Sobky v. Smoley, supra*, 855 F.Supp. at page 1145, Judge David F. Levi wrote, "The legislative history of the 1965 Medicaid Act's single state agency requirement—42 U.S.C. § 1396a(a)(5)—maintains this concentration on administrative efficiency." (Accord, *Hillburn by Hillburn v. Maher, supra*, 795 F.2d at pp. 260-261.) Judge Levi concluded after House and Senate amendments were factored into the competing evidence of legislative intent that Congress's adoption of the single state agency was because, "administrative efficiency appears to have been the overriding purpose . . . ." (*Sobky v. Smoley, supra*, 855 F.Supp. at p. 1145.) In *Fulkerson v. Com'r, Maine Dept. of Human Services* (D.Me. 1992) 802 F.Supp. 529, 538, the district court held: "It appears that the reason for this requirement was to assure 'that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided'

---

[3]Section 1396a (a)(5) states in full: "A State plan for medical assistance must— [¶] . . . [¶] [(a)] (5) either provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan; or provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan, except that the determination of eligibility for medical assistance under the plan shall be made by the State or local agency administering the State plan approved under subchapter I or XVI of this chapter (insofar as it relates to the aged) if the State is eligible to participate in the State plan program established under subchapter XVI of this chapter, or by the agency or agencies administering the supplemental security income program established under subchapter XVI or the State plan approved under part A of subchapter IV of this chapter if the State is not eligible to participate in the State plan program established under subchapter XVI of this chapter[.]"

and 'to avoid a lack of accountability for the appropriate operation of the program.' *Hillburn v. Maher*[, *supra*,] 795 F.2d [at p.] 261 . . . (quoting in part S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S. Code Cong. & Admin.News 1943, 2016-17), *cert.* denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987)."

## 2. *The Federal Single State Agency Regulation*

The HCFA regulation implementing the single state agency requirement is found at title 42, Code of Federal Regulations, part 431.10(e) (2000) (44 Fed.Reg. 17930 (Mar. 23, 1979)) which states: "(e) *Authority of the single State agency*. In order for an agency to qualify as the Medicaid agency— [¶] (1) The agency must not delegate, to other than its own officials, authority to— [¶] (i) Exercise administrative discretion in the administration or supervision of the plan, or [¶] (ii) Issue policies, rules, and regulations on program matters. [¶] (2) The authority of the agency must not be impaired if any of its rules, regulations, or decisions are subject to review, clearance, or similar action by other offices or agencies of the State. [¶] (3) *If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency*." (Second italics added; e.g., *Reynolds v. Giuliani* (S.D.N.Y. 2000) 118 F.Supp.2d 352, 358; *Meachem v. Wing* (S.D.N.Y. 1999) 77 F.Supp.2d 431, 444-445.)

The federal single state agency regulation (42 C.F.R. § 431.10(e) (2000)) was first published in the Federal Register in 1971. (36 Fed.Reg. 3861-3862 (Feb. 27, 1971).) It was originally promulgated, however, in a supplement to a federal handbook issued upon enactment of the Medicaid Act—the United States Department of Health, Education, and Welfare, Welfare Administration, Bureau of Family Services, Handbook of Public Assistance Administration (Handbook), Supplement D—Medical Assistance Programs Under Title XIX of the Social Security Act, D-2130 (June 17, 1966) (Supplement D). The purpose of the Handbook was described as follows: "The Handbook of Public Assistance Administration is issued by the Bureau of Family Services and is the official medium for issuance of interpretations and instructions concerning requirements of the public assistance titles of the Social Security Act and recommendations for the administration of State public assistance programs. The Handbook is prepared for use by State agencies and staff of the Federal agency in carrying out their responsibilities for administering the public assistance programs in accordance with the Federal Act." (Handbook, *supra*, Introduction (June 12, 1963).)

Supplement D stated in part: "[¶] 2. In relationships with other departments of State government, the single State agency interprets its role in such a way that it does not delegate to other than its own officials its requisite ultimate authority for exercising administrative judgment in the State-wide administration or supervision of the plan. [¶] 3. In the event that any rules and regulations or decisions of the single State agency are subject to review, clearance, or other action by other offices or agencies of the State government, the requisite authority of the single State agency is not impaired. [¶] 4. In the event that any services are performed for the single State agency by other State or local agencies or offices, such other agencies or offices are not authorized to, and do not, change, disapprove, or delay action on any administrative decision of the single State agency, or otherwise substitute their judgment for that of the agency as to the application of policies, rules, and regulations promulgated by the State agency. [¶] 5. Any agreements with other public agencies or private organizations to act as the single State agency's agent include provisions for the single State agency obtaining from the agent the data needed for program planning, evaluation, reporting, and accounting purposes and do not in any way impair the *ultimate authority* of the single State agency. . . ." (Handbook, *supra*, Supp. D, D-2130.)

The foregoing Supplement D provisions were transferred to the Code of Federal Regulations in 1971. (36 Fed.Reg. 3860, 3861-3862.) The 1971 regulation stated in pertinent part: "(c) *Conditions for implementing the requirements of paragraph (a)* [*state plan requirements*] *of this section.* (1) The State agency will not delegate to other than its own officials its authority for exercising administrative discretion in the administration or supervision of the plan, including the issuance of policies, rules, and regulations on program matters. [¶] (2) In the event that any rules and regulations or decisions of the single State agency are subject to review, clearance, or other action by other offices or agencies of the State government, the requisite authority of the single State agency will not be impaired. [¶] (3) In the event that any services are preformed for the single State agency by other State or local agencies or offices, such agencies and offices must not have authority to review, change, or disapprove any administrative decision of the single State agency, or otherwise substitute their judgment for that of the agency as. to the application of policies, rules, and regulations promulgated by the State agency." (36 Fed.Reg. 3861-3862 (Feb. 27, 1971.) The current regulation, quoted above, mirrors the language of both Supplement D and the 1971 regulation without substantive change.

■ In addition to the above quoted language ultimately transferred to the Code of Federal Regulations, Supplement D contained a lengthy discussion of the single state agency requirement. There has been no showing that

discussion was ever published in the Code of Federal Regulations or the Federal Register. Therefore, that discussion does not rise to the level of a federal rule or regulation carrying the force and effect of law. (*Western Radio Services Co., Inc. v. Espy* (9th Cir. 1996) 79 F.3d 896, 901-902; *St. Nicholas Apartments v. U.S.* (C.D.Ill. 1996) 943 F.Supp. 966, 969; *Rousseau v. City of Philadelphia* (E.D.Pa. 1984) 589 F.Supp. 961, 971; *Usery v. Board of Ed. of Baltimore Cty.* (D.Md. 1978) 462 F.Supp. 535, 548.) Handbooks issued by federal agencies "generally are considered to be non-binding instructions or internal operating procedures." (*Rousseau v. City of Philadelphia, supra,* 589 F.Supp. at p. 971; *United States v. Harvey* (5th Cir. 1981) 659 F.2d 62, 65; *Concerned Residents of Buck Hill Falls v. Grant* (3d Cir. 1976) 537 F.2d 29, 38; *St. Nicholas Apartments v. U.S., supra,* 943 F.Supp. at p. 969.) The Handbook has no binding force on this court. (*Burroughs v. Hills* (7th Cir. 1984) 741 F.2d 1525, 1529; *Rank v. Nimmo* (9th Cir. 1982) 677 F.2d 692, 698-699; *United States v. Harvey, supra,* 659 F.2d at p. 65.) It is, however, " 'entitled to notice so far as it is an official interpretation of statutes or regulations with which it is not in conflict.' " (*Burroughs v. Hills, supra,* 741 F.2d at p. 1529; *Litton Systems, Inc. v. Whirpool Cor.* (Fed. Cir. 1984) 728 F.2d 1423, 1439.) Indeed, the United States Supreme Court has frequently cited to the Handbook as a source of federal agency interpretation of the Medicaid Act and other Social Security Act public assistance programs. (See, e.g., *Lukhard v. Reed* (1987) 481 U.S. 368, 377 [107 S.Ct. 1807, 1813, 95 L.Ed.2d 328] [Aid to Families With Dependent Children (AFDC)]; *Atkins v. Rivera* (1986) 477 U.S. 154, 162 [106 S.Ct. 2456, 2461, 91 L.Ed.2d 131] [Medicaid]; *Connecticut Dept. of Income Main. v. Heckler* (1985) 471 U.S. 524, 531, fn. 17 [105 S.Ct. 2210, 2214, 85 L.Ed.2d 577] [Medicaid]; *Heckler v. Turner* (1985) 470 U.S. 184, 190, fn. 4, 198-199 [105 S.Ct. 1138, 1142, 1146-1147, 84 L.Ed.2d 138] [AFDC]; *Quern v. Mandley* (1978) 436 U.S. 725, 737, fn. 12 [98 S.Ct. 2068, 2075-2076, 56 L.Ed.2d 658] [AFDC].)

In Supplement D, the federal agency interpreted the single state agency requirement as follows: "The requirement for a single State agency means that one State agency is designated by the State as the 'single State agency' and is authorized to maintain in operation for the State an approved State plan. *The State has a choice of administering the plan through the State agency directly or through its political subdivisions under State agency supervision.* [¶] Once the single State agency is established or designated it is the agency of the State government that *represents the State in its dealings with the Federal agency* on all aspects of the medical assistance plan and its operation. It is the agency of the State government responsible for: obtaining the statutory authority necessary to submit a plan meeting all Federal requirements; preparing the State plan and establishing policies for the operation of the program; assuring that it can carry out the plan in all

political subdivisions; obtaining the State funds or the State-local funds (as the case may be); meeting all audit requirements; and *being accountable to the [Federal agency] for the proper and efficient administration of the program.* [¶] The provision for a 'single State agency' is not designed to set aside the relationships with the Governor and other officers of the State or with other departments of the State government that are normal and proper within the State. The agency designated as the 'single State agency' is still subject to the ordinary legislative processes, executive supervision, and budget and audit procedures in the State. *Other agencies and offices of State government, such as the State fiscal officer and the State civil service agency, may perform services for the single State agency that are essential to the operation of the plan. Another agency or authority of government in the State, however, may not be authorized in the plan, or permitted in practice, to substitute its judgment for that of the 'single State agency' in administrative decisions involving the application of the policies, rules, and regulations promulgated by the State agency.* Similarly, if local agencies administer the plan, the 'single State agency' must see that the authority of such agencies to make administrative decisions under the medical assistance law is not impaired by the action of other agencies or officials of State or local governments. [¶] . . . [¶] *The 'single State agency' is responsible for any services that are preformed by other agencies in the program under the plan. This does not mean that the State agency takes over or directs such services. The agency, however, must take such steps as may be necessary in the State to assure that the services, as performed in the medical assistance program, meet the Federal requirements. . . .*" (Handbook, *supra*, Supp. D, italics added.)

## B. *The State Plan*

A state must submit to the HCFA for approval a plan describing the nature and scope of its Medicaid program and establishing, among other things, a plan for reimbursing providers. (§ 1396a(a); 42 C.F.R. § 430.10 (2000); *Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 502 [110 S.Ct. 2510, 2513-2514, 110 L.Ed.2d 455]; *Children's Hosp. and Health Center v. Belshé* (9th Cir. 1999) 188 F.3d 1090, 1098.) The state plan also must provide for postpayment review of provider claims. (§ 1396a(a)(37); 42 C.F.R. §§ 447.45(c)(1) & (f)(2), 456.3 (2000).) The HCFA is authorized to make payments to states whose medical assistance plans meet the requirements of the federal statute. (§ 1396; *Morris v. Williams* (1967) 67 Cal.2d 733, 738-739 [63 Cal.Rptr. 689, 433 P.2d 697]; *Palumbo v. Myers* (1983) 149 Cal.App.3d 1020, 1025 [197 Cal.Rptr. 214].) Judge Levi has succinctly held: "The [HCFA's] approval of the State plan is a necessary precondition to the State's entitlement to federal funds. (. . . §§ 1396, 1396b(a).)" (*Exeter Memorial Hosp. Ass'n v. Belshé* (E.D.Cal. 1996) 943 F.Supp. 1239, 1240,

affd. (9th Cir. 1998) 145 F.3d 1106, 1109.) As the California Supreme Court observed in *Reese v. Kizer* (1988) 46 Cal.3d 996, 998 [251 Cal.Rptr. 299, 760 P.2d 495], "To assure the continued availability of federal funds for these programs[, including Medi-Cal,] the state must operate plans which conform to the governing federal statutes and regulations." Under HCFA regulations, amendments to state plans must conform to the following regime: "The plan must provide that it will be amended whenever necessary to reflect— [¶] (i) Changes in Federal law, regulations, policy interpretations, or court decisions; or [¶] (ii) Material changes in State law, organization, or policy, or in the State's operation of the Medicaid program. . . ." (42 C.F.R. § 430.12(c) (2000).) HCFA regional staff review state plans and plan amendments. (42 C.F.R. § 430.14 (2000).) The HCFA regional administrator has the authority to approve state plans and plan amendments. (42 C.F.R. § 430.15(b) (2000).) Pursuant to title 42 of the Code of Federal Regulations, part 430.15(a)(1) (2000), "Determinations as to whether State plans (including plan amendments and administrative practice under plans) originally meet or continue to meet the requirements for approval are based on relevant Federal statutes and regulations."

### III. BACKGROUND

The underlying facts are undisputed. California submitted its state Medicaid plan to the HCFA in 1993. The state plan identified the DHS as the single state Medicaid agency for all purposes including auditing payments to providers.

On July 1, 1997, the DHS and the Controller entered into an interagency agreement "for the purpose of increasing the State's auditing ability to identify and recover California Medical Assistance Program (Medi-Cal Program) overpayments . . . ." The interagency agreement authorized the Controller "to perform audit services relating to the Medi-Cal Program," including, in the event of an overpayment, to send a repayment demand to the provider together with a copy of the audit report. The Controller was *not* authorized *as DHS's representative* to withhold payments to providers. However, if the Controller initiated a withhold "under its own [state law] authority," it was required to notify the DHS.[4]

Acting under the interagency agreement, the Controller conducted a review of RCJ's Medi-Cal claims for the period from January 9, 1997, to

---

[4]The interagency agreement set forth the Controller's responsibilities as follows: "1. [The Controller] will perform audit services relating to the Medi-Cal Program . . . . These services will include audits as detailed in the Scope of Work designed to identify overpayments made under the Medi-Cal Program to providers. [¶] 2. The [Controller] will notify DHS Audits & Investigations prior to onsite reviews of Medi-Cal providers. This will reduce duplication of effort by both agencies. [¶] 3. [The Controller's] audits will be finalized in audit reports and draft audit reports will be submitted to the [DHS] at least 15 days prior to issuance. [¶] 4. If the audit identifies an overpayment of Medi-Cal funds, a demand for

October 9, 1997, and a subsequent review for the period from October 10, 1997, to March 26, 1998. The Controller issued final audit *overpayment* findings in reports dated March 10, 1998, and May 4, 1998. RCJ requested an administrative appeal.

On July 1, 1998, the DHS and the Controller entered into an amended interagency agreement. Under the amended interagency agreement, the Controller retained authority to audit Medi-Cal claims by providers and to send repayment demands. However, with respect to the power to *withhold* payments from a provider, the July 1, 1998, amended interagency agreement provided, "Only DHS may initiate a withhold of a provider's Medi-Cal funds during a review, audit, or investigation." The present case involves only an overpayment determination. The Controller did not withhold any funds from RCJ.

On February 1, 1999, Division Seven of the Court of Appeal for this appellate district issued its opinion in *Doctor's Medical Laboratory, Inc. v.*

repayment will be sent to the provider with a copy of the audit report. The demand will provide information to the provider regarding appeal rights. Copies of the audit report and demand for repayment shall be sent to Audits & Investigations and the DHS Office of Administrative Hearings & Appeals. [¶] 5. As a representative of DHS, [the Controller] will not initiate a withhold of a provider's reimbursement in the amount identified by the audit. [¶] 6. However, if [the Controller] initiates a withhold under its own authority, [the Controller] will not issue notices of withhold with the audit report and demand notice. Also, [the Controller] will notify DHS when it initiates payment withholds for Medi-Cal providers. This will facilitate DHS's ability to track Medi-Cal reimbursement disposition and to respond to provider inquiries concerning payment. [¶] 7. [The Controller] will be responsible for the resolution of the audit findings identified in their audits, through and including the administrative appeal process before DHS Office of Administrative Hearings and Appeals (OAHA) under Welfare and Institutions Code section 14171, including legal representation if needed. [¶] 8. [The Controller] will designate the following state member as [the Controller's] contact person for purposes of this agreement: . . . ."

Exhibit A to the interagency agreement entitled "Scope of Work" stated: "A. [The Controller] will target its audits for the following program issues using trend analysis based on Medi-Cal expenditures and historical patterns: [¶] 1. Some non-institutional providers with high volume of selected products engage in unlawful or excessive practices; [¶] 2. Some non-institutional providers with high volume of selected products are incorrectly billing for products or services that should be billed at a lesser reimbursement rate; [¶] 3. Some Pharmacy and DME providers are billing Medi-Cal for unsupported quantities of products; and/or, [¶] 4. Some non-institutional providers are reimbursed improperly and recovery is warranted under title 22, California Code of Regulations, section 51458.1. [¶] B. In performing audits for DHS, [the Controller] will document their results in audit reports. [The Controller] will collect and retain sufficient evidence to substantiate all audit findings and recommendations. [¶] C. The [Controller] will ensure that audit reports are clear, accurate, and meet all of the statutory and regulatory requirements of an audit of Medi-Cal Providers. At a minimum, the audit reports will include a description of the scope of the audit, a reference to Medi-Cal authority, and the methodology used. [¶] D. Specifically, [the Controller] will abide by the following: [specified Welfare and Institutions Code sections and California regulations]."

*Connell* (1999) 69 Cal.App.4th 891, 896-898 [81 Cal.Rptr.2d 829]. In *Doctor's,* the Controller withheld payments to a provider. Our Division Seven colleagues held the Controller could not lawfully exercise the power to audit or to withhold Medi-Cal payments to providers. (*Ibid.*) The California Supreme Court denied review. The remittitur issued on May 26, 1999.

By letter dated March 19, 1999, after the *Doctor's* decision was filed, the DHS asked the HCFA to review the July 1, 1998, amended interagency agreement and to "confirm our opinion about the allowability of the [interagency agreement] activities under the Medicaid program." By letter dated on or about March 24, 1999, Sally Richardson, Director, Center for Medicaid and State Operations, HCFA, responded to the DHS's request. Ms. Richardson's letter, written on behalf of the HCFA, concluded that the amended interagency agreement was "fully compliant with federal single State agency requirements." Further, Ms. Richardson concluded, "[W]e see nothing in [the interagency agreement] that gives [the Controller] discretionary authority that would violate the single State agency requirements at 42 CFR 431.10."[5]

---

[5]Ms. Richardson's letter states in full: "I am writing in response to your March 19 letter concerning the interagency agreement (IA) between the [DHS] and the [Controller] under which the [Controller] conducts audits of Medi-Cal payments to providers. You enclosed a copy of that IA, and asked that we advise whether the specific [Controller] functions performed under it in fact are consistent with DHS' responsibilities as California's single State agency for purposes of Medicaid program administration. [¶] The Medicaid program's single State agency requirements are found in section 1902(a)(5) of the Social Security Act, and at 42 CFR 431.10. The requirement that each State designate a single State agency to administer or supervise the administration of the program dates to enactment of the Social Security Act in 1935, where it appears with reference to the Title I Old-Age Assistance Program. The same wording was incorporated into Title XIX when the Medicaid program was enacted in 1965. The intent in both instances was to ensure that there be a single agency in each State accountable to the federal government for administration of the program in compliance with federal law and policy. [¶] Regulations at 42 CFR 431.10 require that: '. . . .' [quoting the regulation] [¶] California's approved Title XIX State Plan designates the DHS as the single State agency responsible for administering that Plan. The DHS organization chart vests responsibility for fraud and abuse, internal and external audits, and quality control in the Audits and Investigations Division. The Chief of the Medical Review Branch, Audits and Investigations, is the DHS contact point for purposes of the subject IA. Under the IA, the [Controller] is to perform audits on behalf of DHS to identify overpayments made to providers under the Medi-Cal program. The Scope of Work states that the IA is 'for the purpose of increasing the State's auditing ability to identify and recover California Medical Assistance Program (Medi-Cal Program) overpayments and to provide federal matching funds for [the Controller] audit services to the Medi-Cal Program.' The [Controller] must notify DHS Audits and Investigations when it initiates a review, audit or investigation of a Medi-Cal provider. If the [Controller] identifies an overpayment, it is to write the provider describing the overpayment, request repayment, and describe the provider's administrative appeal rights. We understand that such letters instruct the provider to either make payment to the DHS Payment Systems Division, Recovery Section for repayment purposes, if the provider agrees with the overpayment determination or, in the event the provider disagrees with the [Control-

On April 1, 1999, an administrative law judge issued a proposed decision in RCJ's appeal. On June 7, 1999, the DHS rejected the proposed decision. On August 5, 1999, following a review of the administrative record, the DHS issued its final decision. On October 28, 1999, RCJ filed its writ petition in the trial court.

On December 17, 1999, the DHS submitted a state plan amendment to the HCFA. The amended state plan provided in relevant part, "The State Controller's Office will perform audits of Medi-Cal expenditures on behalf of DHS and will submit its findings and recommendations to DHS for appropriate action." The DHS requested an effective date of July 1, 1998. Also on December 17, 1999, the HCFA approved the state plan amendment with an effective date of July 1, 1998, as requested. The HCFA's letter, signed by Karen Fuller, stated in relevant part: "[The state plan amendment] amends the State plan to reflect the fact that the State Controller's Office performs audits of Medi-Cal expenditures on behalf of the Department of Health Services (DHS). [¶] Our review of [the state plan amendment] was conducted in accordance with the requirements of section 1902(a)(5) of the Social Security Act (the Act) and the regulatory provisions at 42 CFR 431.10 and 431.11."

On May 19, 2000, the trial court issued the peremptory writ of mandate in this case. As noted above, the court directed the DHS to set aside its final decision in RCJ's administrative appeal "insofar as it relies upon the audit findings of the State Controller . . . ."

---

ler's] determination, file an appeal with the DHS Office of Administrative Hearings and Appeals. The IA requires the [Controller] to transmit to DHS Audits and Investigations a copy of each audit report and demand letter, and make all related working papers available to DHS for review upon request. In addition, the IA specifies that the [Controller] will make referrals only to Audits and Investigations, and not directly to DHS Recovery, DHS Office of Administrative Hearings and Appeals, or any law enforcement or other agency. [¶] With respect to the fraud referral process, the IA specifies that the [Controller] may recommend to the DHS that it initiate a withhold action when the [Controller] 'collects evidence of potential fraud or willful misrepresentation during an investigation' (Scope of Work, paragraph 10). Federal regulations at 42 CFR 455.23 authorize such withholds by the State Medicaid agency. The IA stipulates that the [Controller] will not make independent fraud referrals to law enforcement agencies, and that DHS will exercise its discretion as the Medicaid single State agency when making such referrals. [¶] Based upon our review of the IA, the pertinent section of the California State Plan, and the applicable federal regulations, we conclude that the IA is fully compliant with federal single State agency requirements. The fact that DHS vests Medi-Cal audit functions in Audits and Investigations does not preclude DHS from augmenting its own audit resources through an appropriate arrangement with the [Controller]. The IA itself states that 'DHS will exercise its authority as the Medicaid single state agency,' and we see nothing in it that gives the [Controller] discretionary authority that would violate the single State agency requirements at 42 CFR 431.10."

## IV. DISCUSSION

### A. *Private Right of Action*

■ The DHS contends RCJ has no "private right of action" to enforce the single state agency requirement embodied in the federal statute (§ 1396a(a)(5)) and its implementing regulation (42 C.F.R. § 431.10(e) (2000)). The DHS discusses federal decisional authority concerning whether a health care provider may bring an action under title 42 of the United States Code section 1983, to challenge state practices under the Medicaid Act. (See *Wilder v. Virginia Hospital Assn., supra,* 496 U.S. at p. 501 [100 S.Ct. at p. 2513]; *Sobky v. Smoley, supra,* 855 F.Supp. at pp. 1130-1133.) Those decisions are inapposite. RCJ does not seek to enforce a private right of action under title 42 of the United States Code section 1983, or otherwise. Rather, RCJ seeks judicial review of a final administrative decision arising from a Medi-Cal audit pursuant to Code of Civil Procedure section 1094.5. Welfare and Institutions Code section 14171, subdivision (j), specifically authorizes such review.[6] RCJ's writ of mandate pursuant to Code of Civil Procedure section 1094.5 is the proper means by which a Medi-Cal provider may challenge an individual audit decision. (Welf. & Inst. Code, § 14171, subd. (j); *Florence Western Medical Clinic v. Bonta'* (2000) 77 Cal.App.4th 493, 502-503, fn. 8 [91 Cal.Rptr.2d 609]; *Frankel v. Kizer* (1993) 21 Cal.App.4th 743, 750 [26 Cal.Rptr.2d 268].) The DHS does *not* contend the issue presented here is beyond the scope of the issues that may be raised upon judicial review pursuant to Welfare and Institutions Code section 14171, subdivision (j).

### B. *Doctor's Medical Laboratory, Inc. v. Connell Is Not Controlling*

■ RCJ, by its writ petition, sought to set aside the DHS's final decision in this case, as "refusing to abide by" the Court of Appeal decision in *Doctor's Medical Laboratory, Inc. v. Connell, supra,* 69 Cal.App.4th at pages 896-898 (*Doctor's*). RCJ contends *Doctor's* controls the resolution of this case. We respectfully disagree. In *Doctor's,* a Medi-Cal provider sought a writ of mandate to compel the Controller to release approximately $3 million in payments that had been withheld. (*Doctor's, supra,* 69 Cal.App.4th at p. 893.) The provider alleged the Controller's refusal to pay the claims had led to its insolvency. (*Id.* at p. 895.) The Court of Appeal found the 1997 interagency agreement improperly authorized the Controller "to perform

---

[6]Welfare and Institutions Code section 14171 provides in pertinent part: "(a) The director shall establish administrative appeal processes to review grievances or complaints arising from the findings of an audit . . . . [¶] . . . [¶] (j) The final decision of the director shall be reviewable in accordance with Section 1094.5 of the Code of Civil Procedure within six months of the issuance of the director's final decision."

audits to identify overpayments to providers, and to take corrective action, presumably withholding sums believed to constitute overpayment." (*Ibid.*)

We need not address the DHS's disagreement with our Division Seven colleagues' conclusions. The *Doctor's* opinion was filed on February 1, 1999. On March 24, 1999, the HCFA, by process of Ms. Richardson's letter, expressed approval of the Controller's audit authority. On December 17, 1999, well after the *Doctor's* opinion was filed, the HCFA approved the use of the Controller as the audit agency effective July 1, 1998. In *Doctor's,* the Court of Appeal did not confront, nor could our Division Seven colleagues have confronted, the subsequent December 17, 1999, federal agency approval of the Controller's contractual authority to audit Medi-Cal payments to providers. The December 17, 1999, HCFA approval happened entirely after the *Doctor's* opinion was filed. The HCFA's approval of the delegated audit authority is squarely presented in this case. Moreover, as discussed below, we conclude we must defer to the HCFA's construction of the federal statutory and regulatory law that it administers as reflected in its December 17, 1999, action.

RCJ contends the HCFA's action is immaterial because the Controller audited it *before* the HCFA expressed its approval. We disagree. By its writ petition, RCJ sought to set aside the DHS's final decision because it relied on the Controller's audit. At the time the DHS issued its final decision, the HCFA had by letter expressed its opinion that the delegation of audit authority to the Controller was fully compliant with federal single state agency requirements. Moreover, at the time the trial court issued its order directing the DHS to set aside its final decision to the extent it relied on the Controller's audit, the HCFA had in addition approved the state plan amendment effective July 1, 1998. Under these circumstances, we conclude, the federal agency's interpretation of its own regulation was squarely presented.

C. *The HCFA's Construction of the Federal Law That It Administers Is Entitled to Deference*

1. *Congress Has Not Specifically Addressed the Precise Question at Issue*

RCJ does not specifically contend nor do we conclude that the HCFA's regulation is an impermissible construction of the federal statutory single state agency requirement. RCJ asserts in general terms that the language of the federal statute and regulation is clear, unambiguous, and mandatory. RCJ contends the plain language and "obvious" meaning of the federal statute (§ 1396a(a)(5)) and the implementing regulation (42 C.F.R.

§ 431.10(e) (2000)) prohibit the DHS from delegating audit authority to the Controller; further, the HCFA's conclusion to the contrary contradicts the federal law and therefore is not entitled to any deference. We disagree.

■ The United States Supreme Court explained the standard to be applied on review of an administrative agency's construction of a statute which it administers in *Chevron, U.S.A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 842-845 [104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694]: "When a court reviews an agency's construction of [a] statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. *Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.* [¶] 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' [Citation.] If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes, the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. [¶] We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. [Citations.] . . . If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned.' [Citation.]" (Fns. omitted, italics added; accord, *Garfield Medical Center v. Belshé* (1998) 68 Cal.App.4th 798, 807-808 [80 Cal.Rptr.2d

527].) Simply stated, once a court determines, after reviewing the legislation, that Congress did not directly address the precise question at issue, the pertinent question is whether the administrative construction in the form of a regulation is reasonable. (*Chevron U.S.A. v. Natural Res. Def. Council, supra,* 467 U.S. at p. 845 [104 S.Ct. at p. 2783]; accord, *Alexander v. Sandoval* (2001) 531 U.S. 1049 [532 U.S. 275, 283 [121 S.Ct. 1511, 1518, 149 L.Ed.2d 517].) As the United States Supreme Court further held in *Chevron U. S. A.,* "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. [Citations.]" (*Chevron U.S.A. v. Natural Res. Def. Council, supra,* 467 U.S. at p. 843, fn. 11 [104 S.Ct. at p. 2782]; *Zenith Radio Corp. v. United States* (1978) 437 U.S. 443, 450 [98 S.Ct. 2441, 2445, 57 L.Ed.2d 337].)

 We consider the language of the federal statute. We find Congress has not directly addressed the precise question at issue; however, the statutory language plainly suggests that a state Medicaid agency may delegate functions to another state agency. Because we are considering a federal statute, we follow rules of statutory construction enunciated by the United States Supreme Court. In *Kaiser Aluminum & Chemical Corp. v. Bonjorno* (1990) 494 U.S. 827, 835 [110 S.Ct. 1570, 1575, 108 L.Ed.2d 842], quoting from *Consumer Product Safety Comm'n v. GTE Sylvania* (1980) 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766], the United States Supreme Court held: "The starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" The United States Supreme Court has noted that "the statutory language controls its construction" (*Ford Motor Credit Co. v. Cenance* (1981) 452 U.S. 155, 158, fn. 3 [101 S.Ct. 2239, 2241, 68 L.Ed.2d 744]) and that "'[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.'" (*Griffin v. Oceanic Contractors, Inc.* (1982) 458 U.S. 564, 571 [102 S.Ct. 3245, 3250, 73 L.Ed.2d 973].) In interpreting a statute, the United States Supreme Court has noted: "'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' [Citations.] Our objective in a case such as this is to ascertain the congressional intent and give effect to the legislative will." (*Philbrook v. Glodgett* (1975) 421 U.S. 707, 713 [95 S.Ct. 1893, 1898, 44 L.Ed.2d 525].) On another occasion, the court stated, "We do not, however, construe statutory phrases in isolation; we read statutes as a whole." (*United States v. Morton* (1984) 467 U.S. 822, 828 [104 S.Ct. 2769, 2773, 81 L.Ed.2d 680], fn.

omitted.) Further, in interpreting a statute, the Supreme Court has emphasized the importance of avoiding: "absurd results" (*United States v. Turkette* (1981) 452 U.S. 576, 580 [101 S.Ct. 2524, 2527, 69 L.Ed.2d 246]); " 'an odd result' " (*Public Citizen v. Department of Justice* (1989) 491 U.S. 440, 454 [109 S.Ct. 2558, 2567, 105 L.Ed.2d 377]); or "unreasonable results whenever possible." (*American Tobacco Co. v. Patterson* (1982) 456 U.S. 63, 71 [102 S.Ct. 1534, 1538, 71 L.Ed.2d 748].) Moreover, the Supreme Court has noted, "Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided." (*Commissioner v. Asphalt Products Co., Inc.* (1987) 482 U.S. 117, 121 [107 S.Ct. 2275, 2278, 96 L.Ed.2d 97].) In *Griffin v. Oceanic Contractors, Inc., supra,* 458 U.S. at page 571 [102 S.Ct. at page 3250], the court stated: "Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling . . . . [Citations.]" When a statute is unambiguous, its language cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the [legislative] process." (*West Virginia Univ. Hospitals, Inc. v. Casey, supra,* 499 U.S. at pp. 98-99 [111 S.Ct. at p. 1147].)

██ As noted above, section 1396a(a)(5) requires that a state Medicaid plan "provide for the establishment or designation of a single State agency *to administer or to supervise the administration of* the plan . . . ." It is clear the federal statute does not specifically address the question whether a state Medicaid agency can delegate audit responsibility to another state agency. It does expressly provide, however, that the designated single state agency will *administer or supervise* the administration of the state plan. The use of the disjunctive means the terms "administer" and "supervise" must be given separate meanings except where the context dictates otherwise. (*Reiter v. Sonotone Corp.* (1979) 442 U.S. 330, 339 [99 S.Ct. 2326, 2331, 60 L.Ed.2d 931]; *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 739-740 [98 S.Ct. 3026, 3035-3036, 57 L.Ed.2d 1073].) ██ To "administer" means "to manage the affairs of" the state Medicaid program. (Oxford English Dict. (2d ed. CD-ROM 1994).) To "supervise" means "[t]o oversee," "to have the oversight of, superintend the execution or performance of (a thing) . . . ." (*Ibid.*) ██ Here, under the plain language of section 1396a(a)(5), the DHS is authorized to *supervise* the administration of the state Medicaid program; that is, to oversee the execution or performance of the program. The federal statute's use of the word "supervise," which means something other than administer, plainly suggests that entities other than the single state agency may be involved in the administration of the program under the Medicaid agency's supervision. Further, as discussed above, the legislative

purpose of the single state agency requirement was both to avoid a diversity of operating standards within a state and to ensure that one agency would be accountable to the federal government for the operation of Medicaid program and compliance with federal law. (*Sobky v. Smoley, supra,* 855 F.Supp. at pp. 145-1146; *Hillburn by Hillburn v. Maher, supra,* 795 F.2d at p. 261.) The language of section 1396a(a)(5) is consistent with that purpose; it requires a Medicaid agency to administer or supervise the administration of the state program (§ 1396a(a)(5)), thereby ensuring consistent operating standards and accountability to the federal government. We conclude, therefore, that although Congress did not speak to the precise question at issue in this case, the statutory language does plainly suggest that a state. Medicaid agency may delegate functions to another state agency. As the United States District Court for the District of Rhode Island held in *King by King v. Sullivan* (D.R.I. 1991) 776 F.Supp. 645, 656-657, "Section 1396a(a)(5) requires that a State Plan provide for a single state agency 'to administer *or to supervise the administration of* the plan.' 42 U.S.C. § 1396a(a)(5) (1988) (emphasis added). The statute does not require states to use only one agency to carry out every task that is part of the State Plan. *See* 42 C.F.R. § 431.10(e)(3) (1990) . . . ."

## 2. *The HCFA's Regulation Is a Permissible Construction of the Federal Statute*

■ We turn to the HCFA's implementing regulation. As discussed above, where, as here, Congress has not directly addressed the precise issue, the question for a state court is whether the federal agency's answer is based on a permissible construction of the statute. (*United States v. Morton, supra,* 467 U.S. at p. 834 [104 S.Ct. at p. 2776]; *Chevron, U.S.A. v. Natural Res. Def. Council, supra,* 467 U.S. at p. 843 [104 S.Ct. at pp. 2781-2782].) We conclude the implementing regulation is a permissible construction of the federal statute.

As noted above, the HCFA interpreted the federal statutory single state agency requirement in title 42 of the Code of Federal Regulations, part 431.10 (2000) as follows: "(e) Authority of the single State agency. In order for an agency to qualify as the Medicaid agency— [¶] (1) The agency must not delegate, to other than its own officials, authority to— [¶] (i) Exercise administrative discretion in the administration or supervision of the plan, or [¶] (ii) Issue policies, rules, and regulations on program matters. [¶] (2) The authority of the agency must not be impaired if any of its rules, regulations, or decisions are subject to review, clearance, or similar action by other offices or agencies of the State. [¶] (3) If other State or local agencies or

offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency." The HCFA's regulation is consistent with both the language and legislative purpose of the federal statute. The implementing regulation requires that the state Medicaid agency retain, and not delegate, *its* ultimate authority to "[e]*xercise administrative discretion in the* administration or *supervision of the [state] plan.*" (42 C.F.R. § 431.10(e)(1)(i) (2000), italics added.) It further requires that the state Medicaid agency retain, and not delegate, it authority to "[i]ssue policies, rules, and regulations on program matters." (42 C.F.R. § 431.10(e)(1)(ii) (2000).) Under the regulation, if another entity performs services for a single Medicaid agency, it "must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute [its] judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency." (42 C.F.R. § 431.10(e)(3) (2000).). The regulation ensures that the single state agency will retain administrative discretion in the supervision of the Medicaid program and will remain accountable to the government of the United States for the state's administration of the program and compliance with federal Medicaid law. We conclude the HCFA's construction of the federal statutory single state agency requirement in title 42 of the Code of Federal Regulations, part 430.10(e) (2000), is a permissible and reasonable one.

3. *Application of the Regulation to the Circumstances of This Case Was Not Plainly Erroneous or Inconsistent with the Regulation*

RCJ contends that the HCFA's application of its own regulation to the circumstances of this case is plainly erroneous or its reasoning is inconsistent with the regulation. We disagree.

The United States Supreme Court has held that a federal agency's interpretation of its own regulation is controlling unless it is " 'plainly erroneous or inconsistent with the regulation.' " (*Robertson v. Methow Valley Citizens Council* (1989) 490 U.S. 332, 359 [109 S.Ct. 1835, 1850, 104 L.Ed.2d 351], quoting *Bowles v. Seminole Rock Co.* (1945) 325 U.S. 410, 414 [65 S.Ct. 1215, 1217, 89 L.Ed. 1700]; *Auer v. Robbins* (1997) 519 U.S. 452, 461 [117 S.Ct. 905, 911, 137 L.Ed.2d 79]; *Martin v. OSHRC* (1991) 499 U.S. 144, 150-151 [111 S.Ct. 1171, 1175-1176, 113 L.Ed.2d 117]; *Udall v. Tallman* (1965) 380 U.S. 1, 16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616].) To paraphrase the Supreme Court in a case involving the Department of Health

and Human Services: "[W]e must defer to the [HCFA's] interpretation [of its own regulation] unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [HCFA's] intent at the time of the regulation's promulgation.' [Citation.]" (*Thomas Jefferson Univ. v. Shalala* (1994) 512 U.S. 504, 512 [114 S.Ct. 2381, 2386-2387, 129 L.Ed.2d 405]; *Christensen v. Harris County* (2000) 529 U.S. 576, 588 [120 S.Ct. 1655, 1663, 146 L.Ed.2d 621] [deference to agency's interpretation of regulation unwarranted where interpretation contradicted plain and clear language of regulation].)[7] The lower federal courts have held the HCFA's interpretation of Medicaid regulations is entitled to great weight and deference. (*New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 421 [93 S.Ct. 2507, 2516-2517, 37 L.Ed.2d 688]; *Visiting Nurse Ass'n of North Shore v. Bullen* (1st Cir. 1996) 93 F.3d 997, 1002; *Nor. C. v. U.S. DHHS* (4th Cir. 1993) 999 F.2d 767, 769-770; *Folden v. Washington State DSHS* (9th Cir. 1992) 981 F.2d 1054, 1058; *Missouri Dept. of Social Services v. Sullivan* (8th Cir. 1992) 957 F.2d 542, 544; *Citizens Action League v. Kizer* (9th Cir. 1989) 887 F.2d 1003, 1007; *Garfield Medical Center v. Belshé, supra,* 68 Cal.App.4th at p. 808; *Dept. of Health Services v. Superior Court* (1991) 232 Cal.App.3d 776, 782 [283 Cal.Rptr. 546]; *Frank v. Kizer* (1989) 213 Cal.App.3d 919, 924 [261 Cal.Rptr. 882]; see *Eisenberg v. Myers* (1983) 148 Cal.App.3d 814, 822 [196 Cal.Rptr. 270].) ▌ As the United States Court of Appeal for the Seventh Circuit held in *Homes for Aging Ass'n v. Medicaid Policy & Planning* (7th Cir. 1995) 60 F.3d 262, 266, the HCFA's interpretation of its own regulations "is of controlling weight unless plainly erroneous or inconsistent with the regulation." As the United States Court of Appeals for the First Circuit explained in *Visiting Nurse Ass'n of North Shore, Inc. v. Bullen, supra,* 93 F.3d at page 1002: "As a federal agency charged with administering the Medicaid program . . . HCFA plainly is entitled to [*Chevron U.S.A. v. Natural Res. Def. Council, supra,* 467 U.S. at pp. 842-843 [104 S.Ct. at pp. 2781-2782]] deference in its interpretations of the [Medicaid] Act and the implementing regulations. [Citations.] Indeed, when a federal agency has promulgated and published a regulation pursuant to its own enabling statute, we review its interpretation of that *regulation* under a standard even 'more deferential . . . than that afforded under *Chevron*' to the agency's interpretation of the Statute. [Citations.] '[P]rovided an agency's interpretation of its own regulation does not violate the Constitution or a federal statute, it must be given "controlling weight unless it is *plainly erroneous* or inconsistent with the regulation."' [Citations.]"

---

[7]The United States Supreme Court's recent decision in *United States v. Mead Corporation* (2001) 533 U.S. 218, 224 [121 S.Ct. 2164, 2170, 150 L.Ed.2d 292] does not change this standard of review. *Mead Corporation* involved a tariff classification by the United States Customs Service. No federal agency interpretation of its own regulation was at issue in *Mead Corporation*.

■ RCJ does not specifically challenge the December 17, 1999, state plan amendment. However, under federal law, when, as here, a state plan or amendment has been reviewed and approved by the HCFA, a party challenging its legality must show that the provisions at issue are " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' before [a court] will find them substantively invalid." (*Concourse Rehabilitation & Nursing Ctr. v. DeBuono* (1999) 179 F.3d 38, 44; *Pinnacle Nursing Home v. Axelrod* (2d Cir. 1991) 928 F.2d 1306, 1313; *California Hosp. Ass'n v. Schweiker* (C.D.Cal. 1982) 559 F.Supp. 110, 116.) In *Homes for Aging Ass'n v. Medicaid Policy & Planning, supra,* 60 F.3d at page 266, the United States Court of Appeals for the Seventh Circuit held: "Indiana's amended [Medicaid] plan was approved by HCFA and is accordingly a product of state and federal agency action. [Citation.] 'A trial court, therefore, must review the plan with the deference accorded federal agency actions.' [Citations.] 'This deference entitles the . . . plan to a presumption of regularity, but does not prevent the court from a thorough, probing, in-depth review.' [Citations.] In conducting this review, the court 'shall hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of procedure required by law.' [Citation.]" Our state courts have recognized that the HCFA's approval of California's Medicaid plan is entitled to deference unless "palpably erroneous." (*Garfield Medical Center v. Belshé, supra,* 68 Cal.App.4th at p. 808; *Eisenberg v. Myers, supra,* 148 Cal.App.3d at p. 822.)

■ We find the HCFA's construction of its own regulation, as reflected in Ms. Richardson's March 24, 1999, letter and the December 17, 1999, approval of the state plan amendment as allowing the DHS to delegate audit responsibility to the Controller, is entitled to deference. RCJ contends the single state agency regulation (42 C.F.R. § 431.10(e)(3) (2000)) specifically prohibits the DHS from delegating *any* administrative discretion to another state agency *unless* expressly authorized to do so by another regulation as, for example, with respect to eligibility determinations (42 C.F.R. § 431.10(c) (2000)).[8] We disagree. The HCFA has, from the inception of Medicaid until

---

[8]Title 42 Code of Federal Regulations, part 431.10(c) (2000) states: *"Determination of eligibility.* (1) The plan must specify whether the agency that determines eligibility for families and for individuals under 21 is— [¶] (i) The Medicaid agency; or [¶] (ii) The single State agency for the financial assistance program under title IV-A (in the 50 States or the District of Columbia), or under title I or XVI (AABD), in Guam, Puerto Rico, or the Virgin Islands. [¶] (2) The plan must specify whether the agency that determines eligibility for the aged, blind, or disabled is— [¶] (i) The Medicaid agency; [¶] (ii) The single State agency for the financial assistance program under title IV-A (in the 50 States or the District of Columbia) or under title I or XVI (AABD), in Guam, Puerto Rico, or the Virgin Islands; or [¶] (iii) The

the present time, interpreted the regulation at issue as allowing a single state Medicaid agency to delegate responsibilities to another state agency. The HCFA has permitted such delegation so long as the single state Medicaid agency: supervises the other agency; remains responsible for that agency's actions; and remains accountable to the federal government for the administration of the state Medicaid plan. (Handbook, *supra*, Supp. D.) In the HCFA's view, a regulation expressly authorizing a state Medicaid agency to delegate *audit* authority to another state agency is not required. As noted above, the current single state agency regulation (42 C.F.R. § 431.10(e) (2000)) states that the state Medicaid agency may rely on other state agencies' services provided that it does not delegate *its* authority, i.e., its ultimate authority: to "[e]xercise administrative discretion in the administration or supervision of the plan"; or to "[i]ssue policies, rules, and regulations on program matters." (42 C.F.R. § 431.10(e)(1)(i) & (e)(1)(ii) (2000).) In addition, title 42 Code of Federal Regulations, part 431.10(e)(2) (2000) states, "The authority of the [state Medicaid] agency must not be impaired if any of its rules, regulations, or decisions are subject to review, clearance, or similar action by other offices or agencies of the State." Another state entity performing services for the state Medicaid agency must not have the authority: "to change or disapprove" the state Medicaid agency's administrative decisions. (42 C.F.R. § 431.10(e)(3) (2000).) Further, the other entity must not have the authority to substitute its judgment for that of the state Medicaid agency "with respect to the application of policies, rules, and regulations issued by the Medicaid agency." (*Ibid.*)

Moreover, it is undisputed the DHS has not delegated to the Controller any authority to issue policies, rules, or regulations on Medi-Cal program matters. Nor do we find that the Controller reviews or takes similar action with respect to the DHS's rules, regulations, or decisions. Further, RCJ has not pointed to, and we have not found, *any* evidence in the record that the Controller has been given authority to change or disapprove any administrative decision by the DHS. Instead, the Controller undertakes, on DHS's behalf, required postpayment reviews of provider claims. RCJ also has not pointed to, and we have not found, *any* evidence in the record that the Controller's office has the authority to substitute its judgment for that of the

Federal agency administering the supplemental security income program under title XVI (SSI). In this case, the plan must also specify whether the Medicaid agency or the title IV-A agency determines eligibility for any groups whose eligibility is not determined by the Federal agency. [¶] (d) *Agreement with Federal or State agencies.* The plan must provide for written agreements between the Medicaid agency and the Federal or other State agencies that determine eligibility for Medicaid, stating the relationships and respective responsibilities of the agencies."

DHS with respect to the application of policies, rules, and regulations issued by the DHS. Nor has the DHS delegated to the Controller any authority to exercise discretion in the administration or supervision of the statewide Medicaid plan. The interagency agreement does not have any bearing on the ultimate authority of the DHS to exercise administrative judgment in the statewide administration or supervision of the Medi-Cal program as conducted under the state plan. What the DHS *has* delegated to the Controller is only the authority to conduct postpayment audits of Medi-Cal provider claims. The DHS has authorized the Controller to: perform audit services, including audits designed to identify overpayments to providers; "target its audits for [specified] program issues using trend analysis based on Medi-Cal expenditures and historical patterns"; document results in "clear, accurate" audit reports meeting "all of the statutory and regulatory requirements of an audit of Medi-Cal providers"; abide by specified state codes and regulations; "collect and retain sufficient evidence to substantiate all audit findings and recommendations"; issue repayment demands; send repayment demands to providers with a copy of the audit report; provide information to the provider regarding appeal rights; and take responsibility for the resolution of audit findings through and including the administrative appeal process. The DHS remains ultimately responsible for postpayment audits of Medi-Cal providers. The DHS supervises the Controller's services. The Controller must notify the DHS's Audits and Investigations Division "prior to onsite reviews of Medi-Cal providers." The Controller must provide draft audit reports to the DHS at least 15 days prior to issuance. The Controller must send copies of an audit report and demand for repayment to the DHS Audits and Investigations Division and Office of Administrative Hearings and Appeals. Given these circumstances, the HCFA could reasonably conclude that, as authorized by title 42 Code of Federal Regulations, part 431.10(e)(3) (2000), the DHS has simply contracted with the Controller to perform required postpayment audits. The HCFA's conclusion that the delegation of audit responsibilities to the Controller is fully compliant with federal single state agency requirements is not plainly erroneous or inconsistent with the regulation. Therefore, it is entitled to and will be accorded controlling weight.

V. DISPOSITION

The trial court's judgment granting a peremptory writ of mandate is reversed. Defendant, the Director of the California Department of Health

Services, is to recover her costs on appeal from plaintiff, RCJ Medical Services, Inc.

Grignon, J., and Armstrong, J., concurred.

A petition for a rehearing was denied August 30, 2001, and respondent's petition for review by the Supreme Court was denied December 12, 2001.